United States Court of Appeals,
Fifth Circuit.

No. 94-60602.

UNITED STATES of America, Plaintiff-Appellee, Appellant-Cross-Appellant,

v.

Antonio GIRALDI, Defendant-Appellant, Appellee-Cross-Appellee.

June 19, 1996.

Appeals from the United States District Court for the Southern District of Texas.

Before BARKSDALE, DEMOSS and PARKER, Circuit Judges.

ROBERT M. PARKER, Circuit Judge:

Defendant-Appellant Antonio Giraldi ("Giraldi") was found guilty after a month long jury trial of 18 counts of money laundering, bank fraud, misapplication of funds and conspiracy. He was sentenced to 120 months in prison, $850 special assessment and released on a $700,000 bond pending appeal. Giraldi's co-defendant, Maria Lourdes Reategui, was convicted during the same trial, appealed, but dismissed her appeal after briefing.[1] We affirm.

## FACTS

In 1989, Giraldi was an international private banker in the Mexico market with approximately two years of experience who worked for Bankers Trust Co. ("BT") in New York as a "relationship manager." His job was to recruit and service the bank accounts of wealthy Mexican individuals. He was also responsible for screening potential clients to determine if their wealth was legitimate.

Giraldi recruited a $2 million deposit from a new client named Aguirre in June 1989, that grew over the next several months to $21 million. There is no dispute that Aguirre was laundering drug money. The central question at trial and on appeal is whether Giraldi knew it was drug money.

Giraldi accepted Aguirre as a client without meeting him. A relationship manager could accept a client that he did not know and had not met if the potential client had a very strong

---

[1]Giraldi adopted the issues and arguments contained in Reategui's brief. However, that brief adds nothing of significance to Giraldi's appeal and we will not separately address the issues raised by Reategui.

recommendation from a known, reputable source. Giraldi circulated an interoffice memorandum ("the Benet memo") at BT that stated that Aguirre had been referred by Alberto Benet, whose family had been "Tier I clients" of Citibank for over 20 years.[2] Giraldi was acquainted with Alberto Benet, a wealthy Mexican businessman and general director of ABSA, a Mexican financial services company, by virtue of having handled the Benet accounts at Citibank, Giraldi's former employer. In order to generate business, Giraldi had given Benet BT promotional literature and his (Giraldi's) business card. Benet testified that he had not, in fact, referred Aguirre to BT. There was evidence that the referral may have come from another ABSA employee, Laura Machuca, who had received Giraldi's literature

[2]The body of the Benet memo reads:

FOR YOUR INFORMATION WE ARE ESTABLISHING A NEW RELATIONSHIP WITH MR. RICARDO AGUIRRE FROM MONTERREY.

MR. AGUIRRE WAS REFERRED TO ME BY ALBERTO BENET, DIRECTOR OF ABSA DIVISAS CASA DE CAMBIO AND ACCIONES BURSATILES CASA DE BOLSA. I HAVE KNOWN ALBERTO FOR MANY YEARS AS HE AND HIS FAMILY HAVE BEEN TIER 1 CLIENTS OF CITIBANK FOR OVER 20 YEARS.

MR. AGUIRRE IS A RANCHER/FARMER, OWNS SEVERAL BUSINESSES SUCH AS TWO FORD DEALERSHIPS (VERA CRUZ/OAXACA) AND SEVERAL GAS STATIONS. ALBERTO BENET HAD TOLD HIM ABOUT US AND SPECIFICALLY, BTAG. THEREFORE, MR. AGUIRRE HAS DECIDED TO ESTABLISH A $2,000,000 U.S.$ ACCOUNT WITH US.

I ASKED MR. AGUIRRE TO COME AND MEET LOUIS AND ME NEXT WEEK IN THE D.F. TO DISCUSS INVESTMENT STRATEGY AND SET UP A DINNER FOR TUES. EVENING AT 8:30 P.M. HE ALSO SAID THAT HE WOULD LIKE TO REFER OTHER POTENTIAL CLIENTS TO US.

I SPOKE TO HIM ABOUT A TRUST/COMPANY AND HE SAID HE WAS VERY INTERESTED AND WE WOULD DISCUSS IT FURTHER NEXT WEEK.

INSTRUCTIONS TO TRANSFER THE $2MM WERE GIVEN TODAY AND WE SHOULD BE RECEIVING THE FUNDS BY THE END OF THE DAY. LAURA MACHUCA FROM ABSA DIVISAS HAS RECEIVED ALL THE DOCUMENTATION WHICH IS BEING SIGNED THIS WEEK. WE HAVE ALREADY RECEIVED A FAX OF THE SIG. CARDS AND I HAVE ALSO REQUESTED A LETTER OF REFERRAL FROM ABSA DIVISAS.

I WILL KEEP YOU POSTED ON ANY DEVELOPMENTS WITH THIS NEW CLIENT.

REGARDS, TONY

from Benet. Further, the statement in the Benet Memo that Benet and his family had been Tier I clients (that is a client who had at least $10 million deposited with the bank) at Citibank for over 20 years was false. The Benet family had an account with Citibank from 1983 that was worth $3 million, and was never designated a Tier I client during 1983-1987. Because Giraldi handled Benet's Citibank account, he would have known that the information in his memo was false.

The signature card signed by the three account holders on Aguirre's account and Giraldi was dated 6-27-89 in New York. Giraldi's records showed that he was in Mexico City that day and could not have witnessed the signatures of the account holders.

Eight months after Aguirre opened his BT accounts, Giraldi was asked to resign from BT. He went to work for American Express Bank International (AEBI) and Aguirre moved his accounts to AEBI shortly thereafter.

The government also introduced evidence that Aguirre had no legitimate source of wealth, which Giraldi would have discovered had he investigated his background. Aguirre worked as a gas station manager in Mexico, was unsophisticated about financial matters, and had no banking references that showed wealth prior to 1989. Giraldi put on the bank forms that Aguirre's wealth was derived from the sale of Mexican ranch land, as well as interest in a car dealership, ranching, and a gas station. Later Aguirre purchased and ran a meat packing plant with part of the money from the accounts at issue in this case. The government introduced information from training seminars attended by Giraldi that described typical money laundering schemes that paralleled the techniques used to manage Aguirre's accounts, although these techniques were not per se illegal.

Other evidence showed that Giraldi and a myriad of other employees from both banks met with Aguirre over a two year period, and no one ever questioned his legitimacy. Aguirre was reported dead following a car wreck in March 1992. The Government implies that he did not die but went into hiding to avoid the legal consequences of his drug business.

SUFFICIENCY OF THE EVIDENCE

A. Standard of review

Giraldi challenges the sufficiency of evidence to sustain the convictions on all counts. This

Court must view the evidence in the light most favorable to the jury verdict and affirm if a rational trier of fact could find that the government proved all essential elements beyond a reasonable doubt. *United States v. Mackay,* 33 F.3d 489 (5th Cir.1994). If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, the conviction should be reversed. *Id.* at 493. In reviewing for sufficiency of the evidence, we consider the countervailing evidence as well as the evidence that supports the verdict. *United States v. Wright,* 24 F.3d 732 (5th Cir.1994).

B. Proof of Giraldi's knowledge of illegal nature of funds

Each count of conviction required the government to prove that Giraldi knew that Aguirre's funds were the proceeds of some form of unlawful activity. The money laundering conspiracy alleged in Count 1 and the substantive money laundering offenses in Counts 2 through 11, under 18 U.S.C. § 1956, require proof that,

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity ...

> Section 1956 also requires proof that the defendant knew the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity. Absent sufficient proof of these elements, the convictions on Counts 1 through 11 are invalid.

> The bank fraud allegations charged in Counts 13 and 14 require proof that Giraldi:

> ... knowingly executed or attempted to execute a scheme or artifice

>> 1) to defraud a financial institution; or

>> 2) to obtain any of the monies, funds, credits, assets, securities or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations or promises ...

The "scheme or artifice" alleged in the bank fraud counts of the indictment describes the introduction of drug proceeds into the banking system in a manner designed to provide drug dealers access to loans, which is the same illegal activity alleged in each of the money laundering counts. Therefore, in order to sustain the bank fraud convictions, there must be sufficient evidence that Giraldi knowingly and willfully introduced the drug proceeds into the banks.

Counts 15 through 18 alleged violation of 12 U.S.C. § 630, by misapplying bank funds knowingly and willfully, with the intent to injure and defraud the bank, based on false and fraudulent pretenses and representations. The bank's money was allegedly misapplied by loaning it to the drug dealers, who used their drug proceeds on deposit as collateral for the loans. The alleged false and fraudulent pretenses and representations were Giraldi's statements concerning the source of Aguirre's wealth. It is well established that the government must prove that Giraldi knowingly participated in the deceptive or fraudulent transaction. *See United States v. Shaid,* 916 F.2d 984 (5th Cir.1990) *cert. denied,* 502 U.S. 1076, 112 S.Ct. 978, 117 L.Ed.2d 141 (1992).

Giraldi contends that the evidence was insufficient to establish that he knew Aguirre's funds were the proceeds of unlawful activity. There is no direct evidence of Giraldi's knowledge that Aguirre's funds were derived from illegal drug sales. Giraldi contends that he made a mistake by not discovering the illegal source of Aguirre's funds, and that the government's proof that he was negligent or that he "should have known" is not sufficient for conviction.

The government answers that the circumstantial evidence was sufficient for the jury to conclude that Giraldi did in fact know or was willfully blind to the source of Aguirre's funds. This argument is supported by the evidence that Giraldi was specifically charged with investigating and knowing his client, was dishonest about the fact that he had not followed the prescribed procedures prior to taking the initial deposit, failed to properly "paper" various transactions during his relationship with Aguirre and took several actions to control the damage once the authorities began to investigate Aguirre's holdings.

After a careful review of the record, we have concluded that the evidence is sufficient to sustain Giraldi's conviction.

In addition to the falsehoods contained in the "Benet memo," Giraldi either personally made or approved false statements in banking records concerning the source of funds coming into and the use of funds flowing out of the Aguirre account. The evidence revealed that Giraldi stated that Aguirre was "invested 100 percent in deposits with Texas banks" prior to opening his BT accounts. The evidence of wire transfers that tracked the source of the money Aguirre deposited showed that

it came from cash deposits into and temporary placement with currency exchange houses rather than deposits with Texas banks. Likewise, the statements concerning the use to which funds from Aguirre's loans and letters of credit were put were false.

In addition to the false statements in the bank records, Giraldi made false statements to a government agent named Iglio who was investigating irregularities in one of Aguirre's accounts shortly after Aguirre's reported death. At that time, the government had seized Green Mountain, an AEBI account for which Giraldi served as account representative, pursuant to a criminal investigation of Rogelio Rodriguez. Aguirre, Aguirre's wife and daughter each owned an interest in Green Mountain and Rodriguez was listed as the fourth owner. This conversation was recorded without Giraldi's knowledge and the recording and transcript were admitted into evidence at trial. During that conversation, Iglio asked Giraldi how he got hooked up with Aguirre. Giraldi lied to Iglio, saying that Aguirre was a client of Banker's Trust where he worked earlier, and had been referred by Banker's Trust. Iglio also asked Giraldi about the relationship between Rogelio Rodriguez and Aguirre. Giraldi claimed that Aguirre had only recently met Rodriguez, who had "never had anything to do with Green Mountain," except that Aguirre had guaranteed a $1.5 million letter of credit for him with Green Mountain's assets, because Aguirre was a generous, naive person. In fact, Giraldi's records, admitted into evidence at trial, showed that Aguirre and Rodriguez were partners in various enterprises and that overlapping ownership by Green Mountain, Aguirre, Rodriguez and seven other trust accounts and businesses formed a complex web of financial relationships that Giraldi's taped statements omitted or denied.

In addition to the false statements in bank records and on the Iglio tape, evidence was introduced concerning Giraldi's extensive background and experience in international banking. He had attended banker training seminars that outlined typical money laundering schemes that were very similar to the banking practices that Giraldi used on behalf of Aguirre. He had been trained and even served as a trainer in know-your-client practices that, had they been employed, would have exposed Aguirre's wealth as illegitimate.

Further evidence showed that the wife of the drug lord Abrego was named on the original

Aguirre Swiss bank account without proper documentation. When proper documentation was requested, she withdrew from ownership rather than provide it. The government offered this as circumstantial evidence that Giraldi knew that the money in the Aguirre accounts was not legitimate.

Although there is no requirement that the Government provide a motive for the charged offense, there was evidence that the motive for Giraldi's crime was the pressure on international bankers to recruit new clients and the concomitant professional and monetary success that comes to those who are able to produce.

Giraldi offers alternate explanations for the evidence at trial. He claims that the Benet memo was partly true, in that the referral came through Benet's colleague Laura Machuca, and that there was no proof that Giraldi believed anything in the memo was false when he made out the memo. The problem with this explanation is that even if the jury were willing to assume Giraldi made a mistake about the original referral, he did not correct it once he talked to Benet and discovered the mistake and even repeated the information in subsequent banking documents. Further, inaccurate information about the size of Benet's deposits and the length of his relationship with Citibank was clearly within Giraldi's knowledge at the time the memo was written and was never corrected.

Giraldi variously describes away the evidence as memory lapses, misstatements, sloppiness, carelessness, failure of Giraldi to be aware of the falsity of statements, both oral and written, and that certain practices, such as vague purpose statements on loan applications, were "standard procedure" in international banking.

This is a close case. However, it is not especially remarkable given that mental state is almost always proved by circumstantial evidence from which the jury must infer guilt beyond a reasonable doubt. Viewed in the light most favorable to the prosecution, the evidence is sufficient to sustain Giraldi's convictions. A rational jury could have found it incredible that carelessness and honest mistakes could account for the complexity of financial gerrymandering required to give Aguirre's transactions the appearance of legitimacy.

Giraldi's additional challenges to the sufficiency of the evidence on the bank fraud and misapplication counts are without merit.

GIRALDI'S MOTION FOR NEW TRIAL

A. Standard of review

The standard of review for the denial of a new trial is abuse of discretion. *United States v. Baytank (Houston), Inc.,* 934 F.2d 599 (5th Cir.1991). This Court must affirm the conviction if a rational jury could have found the elements of the crimes beyond a reasonable doubt. *United States v. Dula,* 989 F.2d 772, 778 (5th Cir.), *cert. denied,* --- U.S. ----, 114 S.Ct. 172, 126 L.Ed.2d 131 (1993). Review does not encompass weighing the evidence or judging the credibility of witnesses. *Id.*

B. Verdict contrary to the evidence

Giraldi moved for a new trial arguing that the verdict on all counts was contrary to the great weight of the evidence. Giraldi advances no additional arguments in this ground of error but asks the Court to perform the sufficiency review under this additional standard and reverse "in the interest of justice." For the reasons stated above, we conclude that a rational jury could have found all of the elements of the crimes beyond a reasonable doubt. Therefore, the district court did not abuse its discretion in denying Giraldi's motion for new trial.

C. Government misconduct during closing argument

The motion for mistrial also complained of government misconduct during closing argument.

Throughout the trial, the government emphasized the false statement, contained in the Benet memo, that Benet referred Aguirre to the bank. The defense's theory was that the referral came indirectly from Benet, through his co-employee Laura Machuca. During the rebuttal portion of final argument the government attorney said:

> Let's go back to this memorandum. Let's talk about Laura Machuca.... They asked why Laura Machuca is not here. You know why? Because the government alleges that this whole thing is false.

> Did you see a letter of referral from anyone in this case? We showed you every document. There is no letter of referral here. Do you think that there was a—there is a Laura Machuca? Do you think if Laura Machuca had anything to do with this that there would have been a letter of referral in that file? You're doggone right because that would have helped in terms of covering up who Mr. Aguirre is. But you didn't see a letter of referral, that's because this isn't true either.

According to Giraldi, the government's argument amounted to a claim that Laura Machuca

had nothing to do with referring Aguirre to Giraldi and that Machuca did not even exist. Such a claim, if made, was false and misleading. The government had taken Laura Machuca's deposition. In that deposition, Machuca testified that Benet gave Giraldi's telephone number to Machuca, who in turn gave it to Aguirre in response to Aguirre's request for information about foreign investments. This deposition testimony was not admitted into evidence, and Machuca, a Mexican citizen, was not available under the court's subpoena power.

The government responds that 1) the prosecutor was not challenging the existence of Machuca, but was instead challenging the existence of a letter of referral from Machuca; 2) the prosecutor was responding to defense counsel's argument, taking the position that Machuca did not do the things attributed to her by the defense and, if she did, the defense would have presented documentary evidence in the form of a letter of referral; and 3) if the comment is construed as challenging the existence of Machuca, it was a rhetorical question suggesting that she could not testify to the facts the defense implied she would, rebutting the defense insinuation that the government had withheld her exculpatory evidence.

The prosecutor's comment clearly implies that Machuca did not exist. However, there was no danger that the jury was misled concerning her existence, given Benet's extensive testimony about her. The prosecutor's other point, that Machuca did not provide a letter of referral for Aguirre, is a sound inference from the evidence. Giraldi's argument is based on the fact that Machuca provided Aguirre with Giraldi's name, bank name and business number. The "letter of referral" which the prosecutor pointed out was missing was a statement that Machuca personally knew that Aguirre's wealth was legitimate. There is no evidence that Machuca had any personal knowledge of the source of Aguirre's wealth.

Given the context within which the comment was made, the district court's denial of Giraldi's motion for new trial was not an abuse of discretion.

### ADMISSION OF EVIDENCE CONCERNING EXTRINSIC MATTERS

We review questions concerning the admissibility of evidence for abuse of discretion. *United States v. Hays,* 872 F.2d 582 (5th Cir.1989).

The district court admitted evidence regarding Giraldi's banking relationship with Jose "Chucho" Castellanos. Giraldi managed Castellanos's deposits at BT, which grew in 1988-89 from $750,000 to $8 million. When Giraldi moved from BT to AEBI, Castellanos eventually transferred his account to AEBI. Giraldi's successor at BT became suspicious of Castellanos because he could be reached only with pagers and codes. In 1991, when BT asked Castellanos for identification, such as a valid passport or driver's license, he closed out the remainder of his BT account. At AEBI, Castellanos's and Aguirre's accounts were cross collateralized. Shortly after the execution of search warrants for records pertaining to Aguirre's accounts, Giraldi took steps to remove the link between the two depositors. Also, there was a document that stated that Castellanos had been referred by a "former Citibank client." The government argued that statement implied that Benet provided the referral, which he did not.

Giraldi argues that there was no evidence that 1) Castellanos was a drug dealer or that his wealth was illegitimate; or 2) that Castellanos had any connection to the alleged conspiracy to launder drug proceeds with Aguirre. He asks this Court to conclude that there was no rational connection between Castellanos and the charged offense, and that the evidence should not have been admitted. Giraldi relies on *United States v. Hays,* 872 F.2d 582 (5th Cir.1989), where this Court reversed a conviction based on the admission of irrelevant, highly prejudicial evidence. He also argues that improper admission of evidence may constitute a violation of due process under the Fifth Amendment, citing *Hills v. Henderson,* 529 F.2d 397 (5th Cir.), *cert. denied,* 429 U.S. 850, 97 S.Ct. 139, 50 L.Ed.2d 124 (1976).

The similarities in the histories of the two depositors, their cross collateralized accounts and Giraldi's reaction to the search warrant all support the trial court's conclusion that the Castellanos's evidence was admissible as part of the conspiracy. Because it was neither irrelevant nor improper, Giraldi's arguments are without merit.

## JURY INSTRUCTIONS

Giraldi contends that the district court erred in refusing his requested jury instructions concerning: a) good faith defense; b) "misapplication" means more than maladministration; c)

violation of civil statute or regulation does not necessarily constitute criminal offense; and d) loan approval for debtor who transfers loan proceeds to third party.

The standard of review on appeal from the denial of a requested jury instruction is whether the district court abused its discretion. *United States v. Pennington,* 20 F.3d 593, 600 (5th Cir.1994). This court must view the evidence in the light most favorable to Giraldi in determining if there is sufficient evidentiary foundation for a requested instruction. *United States v. Lewis,* 592 F.2d 1282, 1286 (5th Cir.1979). The district court abuses its discretion in denying a requested instruction if: 1) the requested instruction is substantively correct; (2) the requested instruction is not substantially covered in the charge given to the jury; and (3) the omission of the instruction would seriously impair the defendant's ability to present his defense. *United States v. Storm,* 36 F.3d 1289, 1294 (5th Cir.1994), *cert. denied,* --- U.S. ----, 115 S.Ct. 1798, 131 L.Ed.2d 725 (1995).

A. Good faith defense

Giraldi's requested instruction stated that good faith is a complete defense, inconsistent with knowingly and willfully committing the offenses alleged in the indictment. The district court stated that its charge would incorporate in a general sense everything that both sides had requested and would "make each count subject to the requirement that the term "knowingly' and "willfully' be proven." The charge given defined the term "knowingly" as "the act was done voluntarily and intentionally" and "not by accident or mistake." The term "willfully" was defined as "the act was committed voluntarily and intentionally, that you did it because you wanted to do it and with a specific intent to do something that the law forbids." Also, the jury was instructed that to convict on the bank fraud and misapplication counts they had to find that Giraldi acted with intent to injure or defraud.

Giraldi cites a Tenth Circuit case which held that the refusal to give the requested good faith instruction is reversible error if the evidence supported such an instruction. *United States v. Haddock,* 956 F.2d 1534, 1547 (10th Cir.), *cert. denied,* 506 U.S. 828, 113 S.Ct. 88, 121 L.Ed.2d 50 (1992). Clear precedent in the Tenth Circuit holds that instructions that do no more than define "willfulness" and "intent to injure or defraud" do not adequately convey a good faith defense to the

jury. *Id.*

The Fifth Circuit has taken a different road on this issue. Here, a district court may refuse to submit an instruction regarding good faith if the defense of good faith is substantially covered by the charge given and the defendant has had the opportunity to argue good faith to the jury. *United States v. Storm,* 36 F.3d at 1294. The charge given here, (omitting specific good faith instruction, but detailing specific intent, and defining "willfully" and "knowingly") was not an abuse of discretion under Fifth Circuit law. *See United States v. Rochester,* 898 F.2d 971, 978-979 (5th Cir.1990).

B. "Misapplication" means more than maladministration

Giraldi requested the following instruction in connection with the misapplication counts.

> Willful misapplication ... means more than maladministration. The acts with which [Giraldi is] accused ... are prohibited misapplications if made in bad faith, not in the honest exercise of official discretion. When actions are performed in good faith and without fraud, for the actual or supposed advantage of the bank, there is no criminal responsibility on the part of the bank officer, although the transaction may be injudicious and unsafe, and even though the transaction results is a loss or damage to the bank. The statute does not punish mere acts of maladministration or negligent use of bank funds.

The district court denied this request. The jury was instructed that, in order to convict on the misapplication counts, it had to find that Giraldi knowingly misapplied funds belonging to the institution and that he acted with the intent to injure or defraud the bank. The following definitions were then given:

> To willfully misapply a bank's money or property means an intentional conversion of such money or property to one's own use and benefit, or for the use and benefit of another, knowing that one had no right to do so.

> To act with the intent to defraud means to act with the intent to deceive or cheat someone, ordinarily for the purpose of causing some finance [sic] loss to another or bringing about some financial gain to oneself.

Giraldi presented evidence and argument that the errors on Giraldi's paperwork were the result of carelessness that did not satisfy the mens rea necessary for a misapplication conviction.

In *United States v. Southers,* 583 F.2d 1302, 1306-1307 (5th Cir.1978) this Court found that it was not error for the district court to refuse a requested instruction that specified that maladministration and bad judgment were not crimes, where the court's instruction on intent was comprehensive and a correct statement of the law. Here, as in *Southers,* the jury could not have

found Giraldi guilty on the basis of the instructions given merely because he committed unintentional or negligent acts of maladministration. We find no abuse of discretion in the district court's denial of Giraldi's requested misapplication instruction.

C. Violation of civil statute or regulation does not necessarily constitute criminal offense

The district court denied the following jury instruction requested by Giraldi:

> You have heard testimony that there is a civil banking regulation requiring financial institutions to retain a record of each extension of credit in excess of $10,000 which identifies the nature or purpose of the extension of credit. A violation of a civil statute or regulation is not a criminal offense. Such a violation would merely subject an institution or, in some cases, an individual, to civil penalties which is not the same thing as a crime.

> You must not consider any evidence concerning civil recording regulations in deciding if the defendant committed the acts charged in the indictment. The only reason that this evidence was admitted is for the purpose of determining, if it does aid your determination, whether or not the defendants had the intent and purpose of violating the law, as charged in the indictment. Before you may consider such evidence, you must first be convinced beyond a reasonable doubt from other evidence in the case that the defendant violated the law as charged in the indictment. If you are so convinced, then this evidence may be considered by you, if you believe it helpful, in determining whether or not the defendant had a motive or intent to commit the crimes alleged in the indictment.

Giraldi complains that the government "constantly" introduced evidence and argument concerning violation of civil regulations, and the requested instruction was an attempt to dispel prejudice created thereby. He also claims that the instruction is a proper statement of the law, based on *United States v. Cordell,* 912 F.2d 769, 776 (5th Cir.1990).

The government points out that Giraldi did not object to the evidence or argument of which he now complains. *United States v. Christo,* 614 F.2d 486, 492 (5th Cir.1980), forbids introducing evidence of civil banking statute violations solely for the purpose of proving criminal misapplication; however, it does not hold that such evidence can never be introduced in a misapplication case. *United States v. Stefan,* 784 F.2d 1093, 1098 (11th Cir.) (cited with approval in *United States v. Saks,* 964 F.2d 1514, 1523 (5th Cir.1992)), *cert. denied,* 479 U.S. 1009, 107 S.Ct. 650, 93 L.Ed.2d 706 (1986). References to banking regulations are appropriate in a criminal trial to explain the role of federal regulators, the rules by which the bank is governed, and the stakes in a bank fraud case. While obviously, each case depends upon its own facts, if the regulations are given too much emphasis, the trial may be impermissibly infected. *Saks,* 964 F.2d at 1523. The government also

contends that the portion of the requested instructions that states that the jury "may not consider" the evidence in determining whether the charged acts occurred is not a correct statem ent of the law. Even if the requested instructions were correct, the government contends that the court did not abuse its discretion in denying the request because the evidence was properly admitted and used at trial, and this was not a case where over-emphasis required corrective instruction. We find that the denial of this requested instruction was not an abuse of discretion.

D. Loan approval for debtor who transfers loan proceeds to third party

The district court refused Giraldi's requested jury instruction that, "You are instructed that you must acquit [Giraldi] of violation of 12 U.S.C. § 630, if the person who signed the note knew that he was expected to pay it and was able to do so." Giraldi argues that the requested instruction is a correct statement of the law under *United States v. Gens,* 493 F.2d 216 (1st Cir.1974).

In *United States v. Parekh,* 926 F.2d 402, 407 n. 8 (5th Cir.1991), this Court explained that *Gens* stood for the proposition that "[a] debtor's financial ability to repay the note is thus necessary but not sufficient to render a loan legitimate." Although the debtor's knowledge and ability to repay the loan are relevant to the issue of the required intent, they are not dispositive of the issue. Therefore the requested instruction is not a correct statement of the law and the district court did not abuse its discretion by denying the request.

## CUMULATIVE EFFECT OF ERRORS

Giraldi contends that the cumulative effect of the errors requires reversal of his convictions. He presents no new information or argument to support this ground of error. Seeing no error to cumulate, we reject this argument.

## GOVERNMENT'S CROSS APPEAL: SENTENCING GUIDELINES

The Government contends that the district court misapplied the sentencing guidelines by giving Giraldi a 4-level reduction for his role in the offense.

The standard of review for a reduction for role in the offense is the clearly erroneous standard. See *United States v. Watson,* 988 F.2d 544, 550 (5th Cir.1993).

U.S.S.G. § 3B1.2 states that a defendant may receive a downward adjustment of four levels

if he was a minimal participant in the criminal activity. Giraldi's Presentence Report (PSR) did not recommend that he was entitled to these four points and Giraldi objected. The district court awarded him the four points, saying, "It shouldn't be, but I will give it to him ... and I will tell you why it shouldn't be. Simply because of the nature of his role, but I can see the scheme of things. That is all right. I will give you those four points."

A downward adjustment under § 3B1.2 is appropriate where a defendant was substantially less culpable than the average participant. *United States v. Gadison,* 8 F.3d 186, 197 (5th Cir.1993). The government contends that the district court's statements on the record amount to an acknowledgment that there was no evidentiary basis under the guidelines for the downward adjustments and that therefore the district court did not correctly apply the guideline. Further, the government contends that the record does not support a finding that Giraldi was entitled to a downward adjustment because he played an integral role in the money laundering conspiracy.

Giraldi reads the district court's comments as finding that there was a basis for the downward adjustment and argues that the record supports that finding. Given that there was no evidence that Giraldi and co-defendant Reategui benefitted financially from the scheme except in the sense that they enhanced their careers at the bank by bringing in a large client, while the other co-defendants laundered large quantities of money and then withdrew it for their personal use, minimal participant status is supported by the record.

RELEASE PENDING APPEAL

The Government contends that the district court erred in ordering Giraldi's release pending appeal without finding that he had demonstrated a substantial question of law or fact likely to result in reversal or a reduced sentence.

The government's position is that the district court did not make the requisite finding and that there was no basis on which the court could have made such a finding.

Giraldi responds that the district court did make the requisite finding, quoting from the record:

THE COURT: I don't find that [Giraldi] is a flight risk.

ATTORNEY: Referring to the next section. The statue [sic] specifically says the Court must also find there are no issues that could possibly result in reversal of the trial.

THE COURT:  I don't find so.

The issues raised by Giraldi on appeal are not frivolous so as to call into question that finding.

## CONCLUSION

For the foregoing reasons, we affirm Giraldi's conviction and sentence, as well as the order for his release pending appeal.  AFFIRMED.