# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-30390

United States Court of Appeals
Fifth Circuit

**FILED**

February 13, 2019

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

SANDRA PARKMAN THOMPSON,

Defendant - Appellant

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:13-CR-243-2

Before HIGGINBOTHAM, GRAVES, and WILLETT, Circuit Judges.

PER CURIAM:*

Sandra Parkman Thompson appeals her convictions for conspiracy, health care fraud, and receipt of health care kickbacks. She was convicted by a jury in the Eastern District of Louisiana as a result of her participation in a health care fraud scheme at Psalms 23, a durable medical equipment ("DME") company, where she worked as a medical marketer. On appeal, Thompson argues that there was insufficient evidence to sustain her convictions and that

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 18-30390

the district court abused its discretion by failing to provide the jury with Thompson's proposed theory of the defense. We affirm.

## I.

Thompson worked as a medical marketer for Psalms 23 Durable Medical Equipment, a DME supply company in New Orleans owned by Tracy Brown. Medicare covers certain DME, which is equipment designed for a medical purpose for repeated use such as power wheelchairs ("PWCs") and accessories, orthotics, walkers, and commodes. For a beneficiary to be eligible for DME under Medicare, a physician is required to examine the patient and determine that the DME is medically necessary. The Medicare supplier manual sets out the requirements for a determination of medical necessity for various DME—for example, Medicare covers PWCs when a patient would be bed- or chair-confined without the wheelchair, is unable to operate a wheelchair manually, and is capable of operating the controls of the power wheelchair. In order for Medicare to pay a claim to a DME supplier, the beneficiary needs a physician's order for the specific piece of equipment and the physician's progress notes showing the diagnosis. The patient then takes the order to any DME supplier, who determines the sizing of the DME and, if applicable, goes to the patient's home to verify that the equipment is compatible. To be eligible for Medicare reimbursement, a DME supplier is required to enroll in the Medicare program and agree to follow Medicare rules. Among other prohibitions, the Medicare rules prevent DME suppliers from accepting kickbacks, or payment for making a referral for DME, and prevent routine waivers of copayments.

Fraud investigators working on behalf of Medicare started investigating Psalms 23 after receiving a fraud alert from Medicare stating that suppliers were billing for the same patients to receive "arthritis kits," an item which

2

No. 18-30390

Medicare does not cover, and PWCs.[1] The fraud investigator referred the case to the Office of Inspector General, detailing the problems with the reimbursement documentation submitted by Psalms 23, including the fact that the documentation submitted was on Psalms 23 letterhead,[2] Psalms 23 did not provide some of the DME for which it sought reimbursement, and many patients did not have progress notes showing diagnosis or treatment that would correspond to DME received.

As a medical marketer, it was Thompson's job to identify patients for potential referral for DME who were covered under Medicare.[3] In an interview with FBI Special Agent Steed,[4] Thompson described her referrals of Medicare beneficiaries, primarily to Dr. Anthony Jase, for PWCs and arthritis kits: she referred family members and those she recruited at community health fairs; wore a lab coat or scrubs to attract people who may have medical needs; and targeted a 55-and-older high-rise, where she had a contact who would give her information about new residents in exchange for beer. Dr. Jase testified that Thompson would refer patients to him, telling him that the patients had been displaced by Hurricane Katrina, had lost their DME in the displacement, and had been disconnected from their doctors. Thompson asked Dr. Jase to write prescriptions for replacement DME for the patients and Dr. Jase would write

---

[1] Twilla Bacon, the investigator, testified that the arthritis kits were a "red flag" because all of the patients were given braces for both arms, both legs, a back brace, and a heating pad which Bacon testified was not a normal order from other suppliers. She testified that it was a red flag for a patient who was prescribed an arthritis kit to be given a PWC because it would be unusual to see braces on both arms and legs along with the use of a power wheelchair.

[2] Bacon testified that forms completed by the doctor would not normally be on supplier letterhead. She stated that "every single form was on a Psalms 23 . . . generated form."

[3] In her interview with FBI Special Agent Steed, Thompson described those patients as those with a "red, white, and blue card."

[4] Special Agent Steed described the tone of the interview as "very cordial, very friendly, non-confrontational."

No. 18-30390

a prescription without having seen or examined the patients.[5] Dr. Jase would sign the order forms prescribing DME and "face-to-face" forms that were supposed to be filled out contemporaneously with seeing a patient. He testified that he never filled out any part of the form other than the signature line. Dr. Jase also stated that Thompson was the only medical marketer he worked with from Psalms 23. Thompson was paid $500 for every patient who received a PWC and $300 for every patient who received an arthritis kit.

In a June 2010 phone call recorded by the government, Dr. Jase called Thompson and informed her that he had spoken to federal agents about signing prescriptions for DME to be supplied by Psalms 23 and another DME company, Lobdale Medical Services, LLC ("Lobdale"). During that call Thompson discussed giving blank order sheets to Dr. Jase to sign and agreed that they would "be on the same page."[6]

In 2010, Thompson was indicted in the Middle District of Louisiana for a separate conspiracy arising out of her work as a medical marketer for Lobdale.[7] The course of conduct in the Lobdale case was almost identical to the instant conspiracy: Thompson participated in a scheme through which Lobdale charged Medicare for durable medical equipment that beneficiaries did not need or did not receive.[8] Thompson received a commission for recruiting individuals to receive equipment and used false information about the

---

[5] Dr. Jase testified that he never saw any of the patients referred by Thompson for the purpose of prescribing DME.

[6] Thompson told Dr. Jase: "We going to be on the same page but let me tell you this. I want, I want you to hear this clear. There ain't no way that I'm gonna let you go down for nothing. I'm not fixing to let you go down on no lie. I'm not fixing to let you go down—if I got to go to jail you ain't going down on nothing."

[7] *United States v. Thompson*, 569 F. App'x 316 (5th Cir. 2014) (per curiam) (affirming Thompson's conviction).

[8] *Id.*

No. 18-30390

beneficiaries to obtain prescriptions and orders for medical equipment from Dr. Jase.[9]

While serving her sentence for her conviction in the Lobdale case, Thompson was indicted in the instant case. On November 1, 2013, a grand jury returned an indictment charging Thompson with one count of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349 (Count 1); one count of conspiracy to pay and receive health care kickbacks, in violation of 18 U.S.C. § 371 (Count 2); five counts of health care fraud, in violation of 18 U.S.C. § 1347 and 18 U.S.C. § 2 (Counts 3–7), and five counts of receipt of health care kickbacks, in violation of 42 U.S.C. § 1320a-7(b)(1)(A) and (2)(A) (Counts 13–18).[10]

The case proceeded to trial and Thompson made motions for acquittal at the close of the government's case and after the close of the defense case which were denied. On November 7, 2017, a jury convicted Thompson of both conspiracy counts (Counts 1–2), two counts of health care fraud (Counts 3–4) and five counts of receipt of health care kickbacks (Counts 13–18). Thompson was acquitted on three counts of health care fraud (Counts 5–7). Thompson filed a post-trial motion for judgment of acquittal which the district court denied. Thompson was sentenced to 32 months' imprisonment. This appeal followed.

## II.

Thompson contends that the evidence was legally insufficient to support her convictions for conspiracy, health care fraud, or receipt of kickbacks. We

---

[9] *Id.*

[10] Thompson was indicted with her alleged co-conspirator, Tracy Brown. Prior to trial, Thompson moved to dismiss the indictment on double jeopardy grounds, arguing that her indictment in this case charged the same offenses of which she had been convicted in the Lobdale case. The district court denied that motion and this court affirmed. *United States v. Thompson*, 690 F. App'x 244 (5th Cir. 2017) (per curiam).

review challenges to the sufficiency of evidence *de novo*, asking whether a rational jury could find that all the elements of the crime were proved beyond a reasonable doubt.[11] In making that determination, "we view the evidence and all inferences to be drawn from it in the light most favorable to the verdict."[12] While "[a] conviction may not rest on 'mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference,'"[13] the conviction will be affirmed "if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"[14]

## A.

Thompson first challenges the sufficiency of the government's evidence of conspiracy. Relying on this court's recent decision in *United States v. Ganji*,[15] Thompson contends that the government's evidence of conspiracy was insufficient because none of the witnesses acted with Thompson to commit the charged conduct and therefore could not provide direct evidence of Thompson's conduct. She emphasizes that the only witness who dealt with Thompson directly was Dr. Jase, whose testimony Thompson suggests actually corroborates the defense theory that Thompson did not know Dr. Jase was planning to prescribe DME without meeting patients.

To support a conviction for conspiracy under 18 U.S.C. § 1349, the government must prove beyond a reasonable doubt that "(1) two or more persons made an agreement to commit health care fraud; (2) that the defendant knew the unlawful purpose of the agreement; and (3) that the

---

[11] *United States v. Chapman*, 851 F.3d 363, 376 (5th Cir. 2017) (citing *United States v. Wise*, 221 F.3d 140, 147, 154 (5th Cir. 2000)).

[12] *United States v. Jones*, 873 F.3d 482, 489 (5th Cir. 2017) (quoting *United States v. Delgado*, 401 F.3d 290, 296 (5th Cir. 2005)).

[13] *United States v. Gonzalez*, 907 F.3d 869, 873 (5th Cir. 2018) (per curiam) (quoting *United States v. Moreland*, 665 F.3d 137, 149 (5th Cir. 2011)).

[14] *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

[15] 880 F.3d 760 (5th Cir. 2018).

defendant joined in the agreement . . . with the intent to further the unlawful purpose."[16] The government can prove the existence of any element through circumstantial evidence,[17] but "proof of an agreement to enter a conspiracy is not to be lightly inferred."[18] To support a conviction of conspiracy under 18 U.S.C. § 371, the government must prove beyond a reasonable doubt "(1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy."[19]

In *Ganji*, the owner of a home health agency and one of its medical directors were charged and convicted with conspiracy to commit health care fraud and health care fraud for participation in a scheme in which agency employees were provided incentives to recruit Medicare beneficiaries.[20] This court reversed the convictions.[21] The government had attempted to prove conspiracy by demonstrating concerted action between the alleged conspirators.[22] However, while the cooperating witnesses themselves admitted to fraudulently certifying patients for home health care, the government witnesses testified that they did not even know one of the defendants and the government had attempted to ascribe the owner of the agency with knowledge of the agreement by sole virtue of her position in the company.[23] While the

---

[16] *Ganji*, 880 F.3d at 767 (quoting *United Staets v. Eghobor*, 812 F.3d 352, 362 (5th Cir. 2015) (internal quotation marks omitted)).

[17] *United States v. Willett*, 751 F.3d 335, 339 (5th Cir. 2014).

[18] *Ganji*, 880 F.3d at 768 (quoting *United States v. Johnson*, 439 F.2d 885, 888 (5th Cir. 1971) (internal quotation marks and alterations omitted)).

[19] *United States v. Mauskar*, 557 F.3d 219, 229 (5th Cir. 2009) (quoting *United States v. Williams*, 507 F.3d 950, 910 n.4 (5th Cir. 2007)).

[20] *Ganji*, 880 F.3d at 763–64.

[21] *Id.* at 763.

[22] *Id.* at 768.

[23] *Id.* at 770, 776.

government can prove that an agreement existed through evidence of the conspirators' concerted actions, "[t]he actions and the surrounding circumstances must be incriminating enough to warrant a finding that the Government proved the existence of an agreement beyond a reasonable doubt."[24] In *Ganji*, the government's "concerted action" evidence was insufficient because the doctors and nurses who testified "spoke of their own fraudulent actions, but never testified that they agreed with [the defendants] to carry out these activities."[25] So while there was evidence of a conspiracy, the government presented no evidence implicating the defendants in that conspiracy and there was not sufficient evidence to allow a rational juror to infer that either defendant had agreed to participate in a conspiracy.[26]

The evidence here is different. Dr. Jase testified that Thompson convinced him to sign DME orders by telling him the beneficiaries' equipment was lost in Hurricane Katrina. In her interview with Special Agent Steed, Thompson stated that she had received referral fees for recruiting PWC and arthritis kit patients and collected DME orders that had Dr. Jase's signature but no patient information. In a recorded phone call with Dr. Jase, Thompson admitted to letting prospective patients pick DME from a catalog without the assistance or supervision of a doctor. In her own testimony, Thompson stated that she would not get paid by Tracy Brown until Dr. Jase signed the approval form for the patient to get the DME. The government also introduced evidence about patients who were referred for DME by Thompson who did not need the equipment and were never examined by Dr. Jase. Dr. Jase testified that he had never seen any of the patients referred by Thompson for the purpose of

---

[24] *Id.* at 767–68 ("Concerted action between the conspirators illustrates that an agreement had to exist because the individuals would not have otherwise acted in that particular manner.").

[25] *Id.* at 770.

[26] *Id.* at 777.

No. 18-30390

describing DME. When viewing the evidence in the light most favorable to the prosecution, the evidence is sufficient for a rational jury to determine that the government proved beyond a reasonable doubt that Thompson participated in the conspiracy.[27]

## B.

Thompson also contends that the evidence adduced at trial was insufficient to support her convictions under the Anti-Kickback statute. Thompson primarily challenges the referral forms—she argues that the government did not make an effort to identify her handwriting on the forms and that there was insufficient evidence for the jury to infer that Thompson had filled out the forms.

The Anti-Kickback Statute prohibits receipt or solicitation of commissions in exchange for referring a Medicare patient to a Medicare provider.[28] To prove a violation of the Anti-Kickback statute's prohibition on soliciting or receiving remuneration for referrals to a federal health care program, the government must prove:

> (1) the defendant solicited or received any remuneration, including any kickback or bribe, directly or indirectly, overtly or covertly, in cash or in kind, to any person; (2) that the remuneration was solicited or received to induce such person to refer an individual to a person for furnishing or arranging of an item or service; (3) that the item or service was one for which payment may be made in whole or in part under a federal health care program; and (4) that the defendant acted knowingly and willfully.[29]

With respect to the knowledge element, the government need not prove that the defendant had "actual knowledge of [the statute] or specific intent to

---

[27] *United States v. Bowen*, 818 F.3d 179, 186 (5th Cir. 2016) (quoting *United States v. Roetcisoender*, 792 F.3d 547, 550 (5th Cir. 2015)).

[28] 42 U.S.C. § 1320a-7b(b)(1)(A).

[29] *United States v. St. Junius*, 739 F.3d 193, 210 n.18 (5th Cir. 2013) (citing § 1320a-7b(b)(1)(A)).

No. 18-30390

commit a violation of [the statute],"[30] but rather that the defendant "willfully committed an act that violated the statute."[31]

Thompson was convicted of receiving kickbacks for referrals of five patients, all of whom had DME prescriptions from Dr. Jase. Dr. Jase testified that he had not examined any of the patients for the purpose of prescribing DME, that his signature was on the prescriptions, and that Thompson was the only Psalms 23 employee he worked with. Dr. Jase also acknowledged that he never filled out any part of the referral form other than the signature line. Psalms 23 employee Patrice Williams confirmed that all of the referrals that Thompson made to Psalms 23 were from Dr. Jase. Special Agent Bradford testified about the link between the number of prescriptions for DME signed by Dr. Jase for arthritis kits and PWCs and the total amount of referral fees received by Thompson by Psalms 23.[32] There was also testimony by Special Agent Bradford about the dates listed in Thompson's referral file for each patient, the dates that Medicare was billed for each patient's DME, and the dates on the Psalms 23 checks to Thompson. Taken together, there is sufficient evidence to sustain Thompson's kickback convictions.

C.

In her final sufficiency challenge, Thompson asserts that there was insufficient evidence to prove that she had the requisite criminal intent to commit health care fraud or receive kickbacks. Thompson emphasizes the testimony of the health care fraud investigator, Twilla Bacon, who acknowledged that she may not expect a medical marketer to have full

---

[30] 42 U.S.C. § 1320a-7b(h).

[31] *St. Junius*, 739 F.3d at 210.

[32] Dr. Jase prescribed 56 PWCs and 66 arthritis kits; Thompson received a commission of $500 for every PWC and $300 for each arthritis kit. The amount that she would have been paid for a referral fee for each Dr. Jase prescription is within $1,000 of the amount she received from Psalms 23 ($48,700).

10

knowledge of the health care rules and regulations. She also points to Special Agent Steed's description of her demeanor during her interview as cordial and non-confrontational as evidence that she had no intent to defraud Medicare.

Thompson likens her case to *United States v. Rufai*, where the Tenth Circuit reversed convictions for aiding and abetting health care fraud, holding that there was insufficient proof of knowledge and intent.[33] In *Rufai*, the defendant had been acquitted on the charge of conspiracy to commit health care fraud and convicted of five counts of aiding and abetting health care fraud.[34] In reversing the aiding and abetting convictions for insufficient proof of the defendant's knowing and willful participation in the fraud, the court noted that the government had tried to prove the defendant's knowledge through his association with his business partner who perpetrated the fraud, resting on a series of inferences that amounted to "impermissible guilt by association."[35] The government had failed to prove that the defendant was exposed to any criminal activity or knew that any illegal activity was taking place—relying solely on his relationship with his partner.[36]

Thompson's reliance on *Rufai* is unavailing. Here, there was evidence of Thompson's repeated exposure to the fraud and evidence from which the jury could rationally infer that Thompson was a knowing participant in the fraud. There was testimony that Thompson drove patients who were fully ambulatory to Dr. Jase and that those patients were able to get in and out of her non-wheelchair accessible car, and that she then proceeded to refer them for PWCs. A rational jury could conclude that she knew she was referring patients who did not need DME. In her recorded conversation with Dr. Jase, Thompson

---

[33] 732 F.3d 1175, 1195 (10th Cir. 2013).
[34] *Id.* at 1178.
[35] *Id.* at 1194.
[36] *Id.* at 1192.

denied receiving $48,000 in profits from her referrals and agreed with Dr. Jase that they would be on the same page in giving a story to the government. While Thompson makes much of her purported belief that Dr. Jase was examining patients that she referred for DME, there was conflicting testimony[37] and it is the province of the jury to "weigh any conflicting evidence and evaluate the credibility of witnesses." [38] We conclude that there was sufficient evidence of Thompson's willful and knowing participation in the scheme to sustain her convictions.

## III.

Thompson also contends that the trial court erred in refusing to charge the jury on its theory of the defense. Thompson proposed a five-paragraph jury instruction that described Thompson's "theory of defense." Determining that the proposed instruction included a statement of contested facts and recited the closing statement that defense counsel had already given, the district court rejected Thompson's proposal. Instead, the district court proposed an alternative instruction omitting the recitation of facts:

> Ms. Sandra Parkman Thompson denies she conspired with anyone at Psalms 23 to knowingly violate any federal law. Nor did she knowingly join in any such conspiracy. As to all counts she contends she did not act with knowledge that her conduct was unlawful.

Thompson's counsel rejected the court's proposal, stating that he would argue his version to the jury and that he objected to the court's more limited instruction.[39]

---

[37] Dr. Jase testified that she dropped paperwork off for DME referrals knowing that he had not examined the patients. Thompson told Special Agent Steed in her interview that she brought patients to Dr. Jase's office.

[38] *United States v. Gibson*, 875 F.3d 179, 185 (5th Cir. 2017) (quoting *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012)).

[39] Counsel stated that the court's proposal would be giving the jury "a shell or giving them a conclusion with nothing to back it up."

No. 18-30390

We review a district court's refusal to include a requested jury instruction for an abuse of discretion and the district court is afforded "substantial latitude" in formulating jury instructions.[40] We ask "whether the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of the law applicable to the factual issues confronting them."[41]

It was well within the district court's discretion to decline to give Thompson's proposed instruction. Examining the charge "in the full context of trial including the final arguments of counsel"—as we must—it is clear that Thompson's contention that she was unaware that her actions were criminal was "fully and completely developed for the jury."[42] "A central purpose of the charge is to provide the framework for the argument by counsel."[43] The district court's instructions did just that: the jury was instructed on each of the crimes charged, including the requirement that the government prove that Thompson acted knowingly and willfully.[44] This court has upheld a district court's refusal to include a "good faith" instruction to the jury where the defense is "substantially covered by the charge given and the defendant has had the

---

[40] *United States v. Daniels*, 247 F.3d 598, 601 (5th Cir. 2001) (*quoting United States v. Rochester*, 898 F.2d 971, 978 (5th Cir. 1990)).

[41] *United States v. Kay*, 513 F.3d 432, 446 (5th Cir. 2007) (internal citation omitted).

[42] *United States v. Fooladi*, 746 F.2d 1027, 1030 (5th Cir. 1984) (citing *United States v. Bush*, 599 F.2d 72, 78 (5th Cir. 1979)). During his closing argument, Thompson's counsel stated: "But in any event, the point of the matter is that—the judge is going to tell you that just because someone like Sandie is mistaken, mistaken about whether what she's doing is criminal, doesn't make it criminal. I'll say it again. The judge is going to tell you, as the arbiter of the law, he will instruct you, which you promised to follow those rules, that a mistake is not the equivalent of guilty. If you make a mistake but you don't know that you made a mistake about something being legal or not legal, it's not criminal."

[43] *Id.*

[44] The court gave the pattern jury instruction definitions of "knowingly" ("the act was done voluntarily and intentionally, not because of mistake or accident") and "willfully" ("the act was committed voluntarily and purposely with the specific intent to do something that the law forbids; that is to say, with a bad purpose either to disobey or disregard the law").

opportunity to argue good faith to the jury."[45] Where the defendant has presented testimony or evidence that she did not intend to commit the charged crime and the jury is instructed on the law of specific intent, a charge sufficiently covers a good-faith defense and the district court does not abuse its discretion in rejecting the defendant's more specific proposed good-faith instruction.[46] "[A] defendant is not entitled to a 'judicial narrative of his version of the facts'" and this court has repeatedly rejected requested instructions that are "more in the nature of a jury argument than a charge" where the instructions as given adequately cover the theory of the defense.[47]

While Thompson's counsel capably articulated cogent reasons why a trial judge may choose to exercise its discretion to include a defendant's requested jury instruction—particularly where jurors are provided with a copy of the indictment—it is not required under existing precedent. The district court did not abuse its discretion here.

## IV.

For the foregoing reasons, we affirm Thompson's convictions.

---

[45] *United States v. Upton*, 91 F.3d 677, 683 (5th Cir. 1996) (quoting *United States v. Giraldi*, 86 F.3d 1368, 1376 (5th Cir. 1996) (internal quotation marks omitted)).

[46] *Id.* (holding that testimony by defendant and instruction on "knowingly" and "willfully" was sufficient); *see also United States v. Brooks*, 681 F.3d 678, 705 n.22 (5th Cir. 2012) ("Here, the Defendants–Appellants were permitted to argue that they acted in good faith and had no intent to defraud, and the jury instructions accurately conveyed the specific intent required to both [charged crimes].").

[47] *United States v. Lance*, 853 F.2d 1177, 1184 (5th Cir. 1988) (quoting *United States v. Barham*, 595 F.2d 231, 244–45 (5th Cir. 1979)); *see also United States v. Stone*, 960 F.2d 426, 433 (5th Cir. 1992) ("Because the elements of agreement and intent—as well as the legal defenses based on lack of agreement—were substantially covered in the charge given to the jury, a theory of the defense that merely recounted the facts without those elements was not required.").