**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Della WHITE, Roy S. White,
Defendants–Appellants.**

No. 91–3407.

United States Court of Appeals,
Eleventh Circuit.

Aug. 4, 1994.

Martin DerOvanesian, Asst. Federal Public Defender, Fort Myers, FL, for Della White.

Mark King Leban, Miami, FL, for Roy S. White.

Paul J. Moriarty, Karla Spaulding, Douglas L. Molly, David P. Rhodes, Tamra Phipps, Tampa, FL, for U.S.

Before COX and CARNES, Circuit Judges, and WOOD *, Senior Circuit Judge.

CARNES, Circuit Judge:

On November 21, 1990, a jury convicted Roy White, a chiropractor, and his wife Della of one count of conspiring to defraud the United States, in violation of 18 U.S.C. § 371, and five counts of submitting false or fraudulent Medicare claims between January and August 1986, in violation of 18 U.S.C. §§ 2 & 287. The jury also convicted Roy White of four additional counts of filing false Medicare claims in 1988 and 1989, and four counts of mail fraud for using the U.S. Mail to submit false claims to Blue Cross/Blue Shield ("Blue Cross") and private insurers, in violation of 18 U.S.C. §§ 2 & 1341. We affirm.

## I. BACKGROUND

The Whites created a series of corporate entities to operate three vascular testing facilities in South Florida.[1] Della White served as president of at least two of these entities and obtained Medicare provider numbers for them. The Whites offered free or inexpensive cholesterol testing and blood screenings at shopping malls and senior citizens' centers. The "patients" were strongly encouraged to visit one of the Whites' three clinics to receive their test results and a free

---

\* Honorable Harlington Wood, Jr., Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

1. In reviewing the Whites' convictions, "we must construe the facts in the light most favorable to the party prevailing in the district court, in this case the Government." *United States v. Lynch*, 934 F.2d 1226, 1232 (11th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 885, 116 L.Ed.2d 788 (1992).

"consultation." When they arrived at the clinic, patients were told that the results of their initial tests were inconclusive or indicated a potential problem and that extensive follow-up testing was recommended. Because the screenings were not performed under proper conditions, false positives frequently resulted, leading to unnecessary follow-up testing. In certain cases, patients were told that the testing revealed serious vascular problems requiring immediate treatment. The Whites then billed Blue Cross, Medicare's agent in Florida, for tests averaging $1,000 per patient. Patients were frequently told to return for periodic retesting, even though such retesting was not medically necessary.

In order to secure Medicare provider numbers, the Whites hired a series of medical doctors to serve as "supervising physicians" at their facilities. In theory, these doctors were to perform physical examinations on patients and to recommend appropriate testing. Although Medicare Part B covers medically necessary diagnostic tests, *see* 42 U.S.C.A. §§ 1395k(a)(1), 1395x(s)(3), & 1395y(a)(1)(A) (1992 & Supp.1994), the program does not authorize payment for diagnostic tests performed or ordered by a chiropractor, 42 C.F.R. § 410.22(b) (1993). However, the testimony at trial established that Roy White would frequently examine the patients himself, determine which tests he considered necessary, and then instruct one of the doctors to prescribe those tests. In other instances, Roy White would order additional tests on his own authority. Roy White's sense of medical necessity was significantly broader than that of his supervising physicians and of the government's expert witness, Dr. Blackshear. Each time suspicion focused on the Whites' activities, the Whites would simply create a new corporate entity—with a new name—to conduct the tests.

Block 19 of Medicare Claim Form 1500 requests the name of the physician who referred the Medicare beneficiary provider for testing. On at least five occasions (counts 2 through 6), both of the Whites submitted Medicare claim forms that named one of the supervising physicians as the referring doctor, when, in fact, Roy White had ordered the tests in question. Block 25 of the claim form is a certification that the tests performed were: "medically indicated and necessary for the health of the patient and were personally rendered by me or were rendered incident to my professional service by my employee under my immediate supervision." On at least four occasions (counts 7 through 10), Roy White submitted claims to Medicare bearing a forged doctor's signature in block 25.

At trial, the Whites argued that Medicare, at least until December 1986, did not prohibit the payment of claims for diagnostic tests ordered by chiropractors. The Whites concede that, under the Medicare statute, chiropractors are only "physicians" for purposes of the act with respect to a manual manipulation of the spine, 42 U.S.C.A. § 1395x(r)(5) (1992 & Supp.1994). However, the Whites argued that the provisions which authorize payment for diagnostic tests, 42 U.S.C.A. §§ 1395k(a)(1) & 1395x(s)(3) (1992 & Supp. 1994), do not require such services to be rendered by a physician or incident to a physician's services. The Whites further maintained that, even if the law did prohibit such payments, "during 1985 and 1986 (the first two years of the period of the indictment), [Roy White], in good faith, believed that as a chiropractor, he could properly bill Medicare for vascular tests that he had ordered." Therefore, the Whites claimed, they lacked the specific intent necessary to violate the false claims statute. *See United States v. Slocum,* 708 F.2d 587, 596 (11th Cir.1983) (stating that one element of a violation of 18 U.S.C. § 287 is the submission of a known false or fraudulent claim to the United States "with the specific intent to violate the law or with a consciousness that what he was doing was wrong").

## II. DISCUSSION

The Whites raise three issues that merit discussion. First, the Whites claim that the district court's instructions on materiality and the court's response to a jury question were "internally inconsistent and confusing," and require reversal. Second, the Whites argue that the Medicare program authorized payment for diagnostic tests ordered by chi-

ropractors prior to December 15, 1986. Third, the Whites contend that the district court violated Fed.R.Crim.P. 30 by modifying its jury charge after closing arguments. We address the first two contentions in subpart A, below, and then turn to the third contention in subpart B.[2]

## A. THE MATERIALITY ISSUE

Counts 2 through 6 alleged that on specified dates between January and August 1986, the Whites submitted Medicare claims that falsely indicated that the billed diagnostic tests were ordered by a medical doctor, who was shown in block 19 to be the referring physician. These claims were false because the tests had actually been ordered by Roy White. With respect to counts 2 through 6, the court instructed the jury that it need not consider whether the false claim was material. However, immediately thereafter, the court instructed the jury that:

> [Y]ou must determine as a factual matter whether at the time alleged in the count line 19 of the [claim form] was required to be filled out. If you find that it was not required to be filled out, I instruct you that it was not material. If it was required to be filled out, then it was material.

The court then instructed the jury that it should apply the same instructions to counts 7 to 10, which charged Roy White with making a false representation in block 25 of four specific claims filed in 1988 and 1989. During its deliberations, the jury inquired of the court: "If we consider line 19 to be not required to be filled out, does this eliminate counts 2 through 6?" The district court, concluding that the jury should never have

been charged on materiality, referred the jurors to the sections of the indictment and charge dealing with counts 2 through 6, omitting, however, all reference to materiality. The jury subsequently found the defendants guilty on all counts.

■ The Whites argue that "the law is clear that . . . materiality is an essential element of a false statements offense." Unfortunately for the Whites, they are charged with filing false *claims* in violation of section 287 and not with making false statements in violation of 18 U.S.C.A. § 1001 (1976). Materiality is an element under section 1001, *United States v. Beer*, 518 F.2d 168, 170–71 (5th Cir.1975); however, we have never held that materiality is an element under section 287. We have previously touched upon this issue only once. In *United States v. Haynie*, 568 F.2d 1091, 1092 (5th Cir.1978) (*per curiam*), we observed that "the issue of whether materiality is an element of a section 287 charge has not been squarely presented to and decided by this court." Without holding that materiality is an element of a section 287 offense, we concluded that *if* materiality is a required element, "the issue is one for the trial judge to handle as a question of law." *Id.* Because the district court had correctly found that the misrepresentations in that case were material, we affirmed Haynie's conviction under section 287 without determining whether materiality is an element under that section. *Id.* The four circuits that have addressed the issue of whether materiality is an element of a section 287 offense are evenly split. *Compare United States v. Pruitt*, 702 F.2d 152, 155 (8th Cir.

**2.** The Whites raise a number of other challenges to their convictions. Both defendants argue that the district court erred by (1) failing to grant their motions for judgment of acquittal; and (2) excluding as cumulative a computer printout demonstrating that Blue Cross had paid Medicare claims submitted by Roy White. Della White also argues that the district court erred in not granting her motion for a severance. We conclude that those contentions are meritless and do not warrant further discussion.

The Whites also raise several challenges to the district court's calculation of their sentences. Both defendants argue that the district court improperly: (1) imposed a double enhancement based on the same conduct by increasing their

sentences for more than minimal planning or a scheme to defraud more than one victim *and* for being an organizer or leader (Roy) or a manager or supervisor (Della); (2) imposed restitution without making a finding on their ability to pay; and (3) determined the amount of loss based on a nonrandom sample. Della White also argues that the district court should not have sentenced her under the guidelines because she had withdrawn from the conspiracy prior to the guidelines' effective date and that, if guideline sentencing was proper, the district court should have applied a downward adjustment because her role in the offense was minor. We conclude that these contentions, too, are devoid of merit and warrant no further discussion.

1983) (holding that materiality is an essential element of a section 287 charge) *and United States v. Snider,* 502 F.2d 645, 652 n. 12 (4th Cir.1974) (same) *with United States v. Parsons,* 967 F.2d 452, 455 (10th Cir.1992) ("[M]ateriality is not an element required by 18 U.S.C. § 287.") *and United States v. Elkin,* 731 F.2d 1005, 1009 (2d Cir.) ("Since the language of § 287 in no way suggests that materiality is an element of the offense, we conclude that proof of materiality was not required."), *cert. denied,* 469 U.S. 822, 105 S.Ct. 97, 83 L.Ed.2d 43 (1984).

 We need not align ourselves on either side of this intercircuit split, because the present case is controlled by our own *Haynie* decision. Here, as in *Haynie,* because the misrepresentations were material, it does not matter whether materiality is an element of a section 287 charge. The district court realized that it should not have submitted the question of materiality to the jury.[3] Although it withdrew the issue from the jury, the district court never made a clear finding of materiality. However, because materiality is a question of law, the district court's ruling, had it made one, would have been subject to *de novo* review in this Court. We see no reason not to address this legal issue, which the parties have fully briefed and argued, in the first instance, instead of remanding the case to the district court.

 In our section 1001 false statements case law, we have held that a statement is material if it " 'has a natural tendency to influence, or was capable of influencing, the decision of the tribunal in making a determination required to be made.' " *United States v. Beer,* 518 F.2d 168, 171 (5th Cir.1975) (quoting *United States v. Krause,* 507 F.2d 113, 118 (5th Cir.1975)). Given the shared history and purpose of sections 287 and 1001, if materiality is indeed an element under section 287, it should be measured by the same yardstick as under section 1001. *Cf. United States v. Bramblett,* 348 U.S. 503, 509, 75 S.Ct. 504, 508, 99 L.Ed. 594 (1955)

(detailing the common origin and legislative evolution of the two sections); *United States v. Johnson,* 284 F.Supp. 273, 278 (W.D.Mo. 1968) ("The very purpose of sections 287 and 1001 is to protect the government against those who would cheat or mislead it in the administration of its programs."), *aff'd,* 410 F.2d 38 (8th Cir.), *cert. denied,* 396 U.S. 822, 90 S.Ct. 63, 24 L.Ed.2d 72 (1969). Thus, the central question in this case is not, as the district court apparently believed, whether completion of blocks 19 and 25 was mandatory, but instead, whether the false answers inserted in those spaces "ha[d] a natural tendency to influence, or [were] capable of influencing" the decision to honor or reject the claims. *Beer,* 518 F.2d at 171. We conclude that they did.

 To determine whether the false entries in blocks 19 and 25 of the Medicare claim forms listed in the indictment constituted material falsehoods, we must first address the Whites' claim that until December 15, 1986, the Medicare program authorized payment for diagnostic tests ordered by a chiropractor. We conclude that the Whites' interpretation of the governing statute and regulations is in error. From the start of the Whites' activities in July 1985 until December 15, 1986, 42 C.F.R. § 405.232b(c) (1977) provided: "Payment may be made only for the chiropractor's manual manipulation of the spine to correct a subluxation (demonstrated by X-ray to exist) which has resulted in a neuromusculoskeletal condition for which such manipulation is appropriate treatment. *No reimbursement may be made for X-rays or other diagnostic or therapeutic services.*" (Emphasis added). Effective December 15, 1986, the regulations were revised. Section 405.232b(c) was replaced by section 410.22(b), which provides:

(1) Medicare Part B pays only for a chiropractor's manual manipulation of the spine to correct a subluxation, if X-ray demonstrates that a subluxation exists and if the

---

**3.** Because of our holding in *Haynie* that any materiality issue that does exist under section 287 is an issue of law for the court, 568 F.2d at 1092, it was error for the district court in this case to submit that issue to the jury. However, the error was harmless. The addition of another element into the instructions does not call into question the reliability of the jury's verdict as an indication that it found beyond a reasonable doubt the existence of those elements of the section 287 charge that were properly submitted to the jury.

subluxation has resulted in a neuromusculoskeletal condition for which manipulation is appropriate treatment.

(2) Medicare Part B does not pay for X-rays or other diagnostic or therapeutic services *furnished or ordered by a chiropractor.*

(Emphasis added). The Whites maintain that under former section 405.232b(c) it was unclear whether Medicare would pay for diagnostic tests ordered by—as opposed to furnished by—a chiropractor; after all, they argue, "the federal agency thought it necessary to clarify" the regulation in 1986. We disagree.

"The Social Security Act unambiguously provides that a chiropractor's services are not routinely covered." *Mayers v. U.S. Dep't of Health & Human Serv.,* 806 F.2d 995, 1000 (11th Cir.1986), *cert. denied,* 484 U.S. 822, 108 S.Ct. 82, 98 L.Ed.2d 44 (1987). For Medicare purposes, chiropractors are physicians only "with respect to treatment by means of manual manipulation of the spine." 42 U.S.C.A. § 1395x(r)(5) (1992 & Supp. 1994). This limited inclusion was added by Congress in 1972. Social Security Amendments of 1972, Pub.L. No. 92–603, § 273, 1972 U.S.C.C.A.N. (86 Stat.) 1548, 1698. In *Mayers* we held that "[i]n light of the explicit detail in which Congress narrowly defined reimbursable chiropractic services, no individual could reasonably conclude that other services performed by a Doctor of Chiropractic medicine would be reimbursable." *Mayers,* 806 F.2d at 1000.[4]

Under the Whites' proposed reading of section 405.232b(c), Medicare would not cover tests performed by a chiropractor, but would pay for the same tests, performed by someone else at the chiropractor's direction or under his supervision. Such an interpretation makes no sense. Our conclusion, that at no time relevant to this case did the Medicare program authorize payment for diagnostic tests furnished or ordered by a chiropractor, is strengthened by a 1968 Department of Health, Education, and Welfare (HEW) study which concluded:

"Chiropractic theory and practice are not based upon the body of basic knowledge related to health, disease, and health care that has been widely accepted by the scientific community. Moreover, irrespective of its theory, the scope and quality of chiropractic education do not prepare the practitioner to make an adequate diagnosis and provide appropriate treatment. Therefore, it is recommended that chiropractic service not be covered in the Medicare program."

*Rastetter v. Weinberger,* 379 F.Supp. 170, 174 (D.Ariz.1974) (quoting HEW, *Independent Practitioners Under Medicare: A Report to the Congress* 197 (1968)), *aff'd,* 419 U.S. 1098, 95 S.Ct. 767, 42 L.Ed.2d 795 (1975). As the HEW study indicates, the problem confronting the regulation's drafters was not that chiropractors lacked the technical ability to perform diagnostic tests, but instead, that they were ill-prepared to make adequate diagnoses and to determine a medically appropriate course of treatment. If Medicare were to pay for chiropractor-ordered diagnostic tests, the program would, in effect, be putting its seal of approval on the chiropractor's diagnostic medical abilities. We think that this is exactly what section 405.232b(c) was designed *not* to do. The most reasonable reading of the statute and regulations, even before December 15, 1986, was that the Medicare program did not authorize payment for diagnostic tests performed or ordered by a chiropractor. We hold that at all times relevant to this case, Medicare Part B did not allow payment for diagnostic tests furnished or ordered by Roy White, because he was a chiropractor.

At trial, Roy White testified that Blue Cross had previously honored claims submitted under his name. If true, this testimony was relevant to the Whites' claim that they had a good faith belief that they were entitled to Medicare reimbursement. However, it is scarcely probative of the actual state of the law. Government programs are administered by people and people occasionally make mistakes. Those mistakes do not change the law.

---

4. Although *Mayers* was decided on December 22, 1986, one week after section 410.22 took effect, the events at issue in that case necessarily occurred before December 15.

Because the Medicare program was not authorized to pay for diagnostic tests ordered or furnished by a chiropractor, the Whites' claims should not have been honored had the claims adjustors realized that Roy White was a chiropractor and that he had furnished or ordered the tests being billed. Thus, the false representations that the tests were ordered by (block 19) and performed by (block 25) a medical doctor were clearly capable of influencing Blue Cross' decision, on behalf of Medicare Part B, about whether to honor the claims. Had block 19 been completed truthfully, it would have indicated that the billed tests were performed upon the order of a chiropractor, and the law would have required Blue Cross to deny the claims. The insertion of false information, namely the representation that a medical doctor had ordered the tests, made it significantly more likely that the claims would be paid.

There was conflicting evidence at trial as to whether completion of block 19 was mandatory. However, whether Medicare would have honored the claims had block 19 been left blank is beside the point, because block 19 was not left blank in any of the claims covered by counts 2 through 6. Instead, it was filled in with false information which had a natural tendency to influence Blue Cross to pay a claim which, under the law, it should not have paid. That is all the materiality, if any, required under section 287.

Counts 7 through 10 involved false representations in block 25 of the claim form. Robert Foster is a policy specialist with the Health Care Finance Administration (HCFA), the federal agency that administers the Medicare and Medicaid programs. He testified that the person signing block 25 of the Medicare Claim Form 1500 subscribes to the attestation printed on the reverse of the form "that the service that he is billing for was medically necessary and indicated." William Carter, Blue Cross' supervisor of Medicare Part B program integrity, testified that block 25 was relevant to Blue Cross' determination to pay a claim: "The claim form must be signed by the physician or supplier in order for us to pay for a service." Loraine Molinari, a defense expert, testified, however, that although completion of block 25 was required, the block did not necessarily have to be completed by a medical doctor. Instead, "the owner of [an independent] lab or somebody who was an agent of the laboratory would sign that particular block." Nonetheless, even Molinari conceded that the person signing block 25 "is saying that [the claim form is] certainly true," and certifies that the services being billed were medically indicated and necessary. The fact that any agent of the laboratory could have signed block 25 is not determinative. By falsely inserting the name of a medical doctor in block 25, Roy White once again made it appear that a medical doctor (and not a chiropractor) had decided that the tests were medically necessary and performed the diagnostic tests or supervised their performance. As with the false entries in block 19, the misrepresentations in block 25 would have the natural tendency to persuade Medicare that a medical doctor and not a chiropractor had made the diagnosis resulting in the tests covered by the claim form. Thus, the forged signatures in block 25 were material as a matter of law.

## B. THE RULE 30 ISSUE

█ The trial court initially agreed to a defense request to instruct the jury that only after December 31, 1986, did the Medicare regulations prohibit payment for diagnostic services furnished or ordered by a chiropractor.[5] During closing arguments, counsel for Roy White briefly referred to this alleged change in the Medicare regulations. However, after the closing arguments, the government renewed its argument that the Medicare statute had always limited coverage for chiropractic services to manual manipulation of the spine. The court accepted the government's position, deleted the "after December 31, 1986" language from its pre-printed charge, and expressly informed the jury of the deletion when delivering its oral charge.

5. Although the deleted instruction referred to December 31, 1986, it is undisputed that the revised Medicare regulation, section 410.22(b), actually took effect on December 15, 1986. *See* *Medicare and Medicaid Programs: Miscellaneous Conforming Amendments*, 51 Fed.Reg. 41332, 41332 (1986). This difference in dates has no bearing on any issue in this appeal.

The defense objected to the post-argument modification of the jury instructions.

Federal Rule of Criminal Procedure 30 requires the trial court to "inform counsel of its proposed action upon [counsel's requested jury instructions] prior to their arguments to the jury." Fed.R.Crim.P. 30. "This circuit requires substantial compliance with Rule 30, and a conviction will be reversed due to a violation of the Rule only where a defendant establishes prejudice." *United States v. Pena*, 897 F.2d 1075, 1084 (11th Cir.1990) (citing *United States v. Clark*, 732 F.2d 1536, 1541 (11th Cir.1984)). The purpose of Rule 30 is to "enable[ ] counsel to argue intelligently the case to the jury." *Id.* Reversal is warranted " 'only if counsel's closing argument was prejudicially affected thereby' " or the party " 'was unfairly prevented from arguing his or her defense to the jury or was substantially misled in formulating and presenting arguments.' " *United States v. Foppe*, 993 F.2d 1444, 1451 (9th Cir.1993) (quoting *United States v. Gaskins*, 849 F.2d 454, 458 (9th Cir.1988)), *cert. denied,* —— U.S. ——, 114 S.Ct. 615, 126 L.Ed.2d 579 (1993). Such prejudice has been found to exist "when the change in the instructions is substantial, when the judge's instructions repudiate counsel's argument, or when the judge's instructions impair the effectiveness of the attorney's argument." *Clark*, 732 F.2d at 1541–42 (footnotes omitted).

In this case, the district court initially stated that it would instruct the jury that the Medicare program did not authorize payment for diagnostic tests furnished or ordered by a chiropractor after December 31, 1986, which would mean that it did authorize payment for those furnished or authorized before that date. After the closing arguments, however, the district court correctly determined that at no time relevant to this case did the Medicare program authorize payment for such tests—not before December 31, 1986, and not afterwards. The Whites argue that, "regardless of the propriety of the promised jury instruction," the court's post-argument modification of its charge violated Rule 30. According to Roy White, his trial counsel "expressly and vigorously argued" that White's actions were legal until 1987. The

Whites argue that the court's change in the instruction, "effectively eviscerated" their good faith defense. Although only counts 2 through 6 involve activity which occurred entirely before December 31, 1986, the Whites maintain that the court's action so undermined defense counsel's effectiveness in the eyes of the jury as to require a reversal of their convictions on all counts. We disagree.

First, we cannot agree that trial counsel relied in any significant way upon the court's promised charge that only after December 31, 1986, were payments for the services in question prohibited. Della White's trial counsel did not even mention the Medicare rules concerning chiropractors in closing argument. In a closing argument whose transcript is thirty-eight pages long, Roy White's trial counsel made only the following equivocal references to the issue of whether the applicable law or regulations changed materially in December 1986:

> In December of 1986 because of this confusion that I didn't generate, Dr. White didn't generate, and even Mr. Moriarty [the AUSA] didn't generate—I'm sorry, excuse me—they decided in December of 1986 and we're not going to pay. We are not going to pay for x-rays or other diagnostic or therapeutic services furnished or ordered by a chiropractor. So they ended up stating that policy. I'm talking about '86, December....
>
> . . . .
>
> The Government found eight files and then they're trying to say, "Gee, Dr. White may have ordered something." Well, ordering doesn't mean that you're trying to commit a fraud. If you're working with someone and there's something necessary, I don't think there's any testimony to say that Holter monitors weren't necessary on Ms. Muskus, Ms. Smokay, Ms. Ray, whatever it was. You go through somebody's files and you find something like that then he's willfully out there saying I've got a contract with these doctors because of a coverage problem that occurred or they came up with something in December 31, 1986, that Dr. White is in there full time

ordering things behind their back. Behind their back.

We think it telling that, when Roy White's counsel objected to the court's modification of the instruction, the court could not "recall [his] arguing that point at all," and counsel himself responded: "I think I did, Your Honor, yes. I—you know, I used December, '86, and it was in a *passing comment.*" (Emphasis added). At oral argument, appellate counsel for Roy White attempted to distance himself from trial counsel's characterization of his own closing argument. But trial counsel and the district court judge were there; they heard the remarks as they were made and were better able to judge the significance of those remarks—or lack thereof—in context. We conclude that trial counsel's only reference to the promised jury instruction was a passing comment, an oblique and ambiguous reference.

There is a second reason that the court's failure to give the promised instruction about the law or regulations changing in December 1986 did not so undermine the defense as to require reversal: the Whites' defense was that they had acted in good faith. The Whites argued that they believed they could lawfully submit claims to Medicare for tests ordered by a chiropractor, and, therefore, they lacked the mental state required for commission of the crime. That the defendants' understanding of the law was wrong— and that the district court so informed the jury—does not vitiate their good faith defense. The fact that the Medicare program never authorized payment for diagnostic tests ordered or furnished by a chiropractor did not preclude the jury from finding that the Whites had a good faith belief to the contrary. By its verdict, however, the jury rejected the Whites' claim that they had acted on the basis of such a belief.

### III. CONCLUSION

The false representations in blocks 19 and 25 of the Medicare claims covered by the indictment were material as a matter of law. The jury's verdicts indicate that the jury found all of the other elements of the section 287 violations to be established beyond a reasonable doubt. Any error caused by the district court's instructions to the jury on materiality or by the district court's violation of Rule 30 was harmless. AFFIRMED.