**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

**No. 95-50206**

---

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**VERSUS**

**ANTONY MICHAEL UPTON,**
**SANTA BARBARA CASTLE DEVELOPMENT CORP.,**
**a/k/a Castle Construction Corp., and**
**RONALD R. BARRICK,**

**Defendants-Appellants.**

---

Appeal from the United States District Court
For the Western District of Texas

July 29, 1996

Before GARWOOD, DAVIS, and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

Ronald Barrick, Antony Upton and Santa Barbara Castle Development Corporation, a/k/a/ Castle Construction Corporation, were convicted on numerous counts of conspiring to defraud the United States Air Force in violation of 18 U.S.C. § 286, and for submitting false claims and making false statements to the Air Force for reimbursement of bond premiums in violation of 18 U.S.C. §§ 287 and 2. Barrick was also convicted on three additional counts of making, or causing to be made, a fraudulent statement of

material fact to the Air Force in violation of 18 U.S.C. §§ 1001 and 2. The district court sentenced Barrick to 63 months imprisonment, three years supervised release, and ordered Barrick to pay restitution of $1,804,879.99. The district court sentenced Upton to 24 months imprisonment, three years supervised release and ordered Upton to pay $363,813.69 in restitution. Castle Construction, the corporate defendant, was sentenced to five years probation and ordered to pay $363,813.69 in restitution. On appeal, Barrick, Upton and Castle Construction challenge their respective convictions and sentences. We affirm in part and vacate and remand in part.

## I. Background and Procedural History

Retired United States Air Force Colonel Ronald Barrick, a practicing lawyer prior to these proceedings, owned Benefax Surety Corporation (Benefax) and United Fidelity and Trust Company (United Fidelity). Benefax, a Texas corporation, operated as a small surety bond brokerage business and received finders fees from construction contractors for locating individual sureties who would provide and guarantee the payment and performance bonds required by government contracts. The corporation had two full-time employees and two part-time employees. Roland Maness, a certified public accountant, and Pamela McDaniels, a licensed bonding agent and office manager, worked full-time. Two students, Susan Frericks and Christine McDaniels, provided part-time help. Barrick's other business, United Fidelity, a regulated Texas trust company, made

business loans to contractors who required start up or mobilization funding.

Barrick's co-defendant, Antony Michael Upton, owned a small construction company, Santa Barbara Castle Development Corporation a/k/a Castle Construction (Castle). Castle built roofs for small residential and commercial buildings.

In the summer of 1989, Vandenburg Air Force Base in California sought fixed price bids from civilian contractors on two roofing contracts. Castle submitted a successful bid on Air Force contracts, No. F04684-89-C-0047 and F04684-89-C-0052 (hereinafter No. 47 and No. 52). The Miller Act, 40 U.S.C. § 270(a), required Castle to provide both a performance bond and a payment bond after its successful bid.[1]

---

[1] The Miller Act provides, in pertinent part:

Before any contract, exceeding $25,000 in amount, for the construction, alteration, or repair of any public building or public work of the United States is awarded to any person, such person shall furnish to the United States the following bonds, which shall become binding upon the award of the contract to such person, who is hereinafter designated as "contractor":

(1) A performance bond with a surety or sureties satisfactory to the officer awarding such contract, and in such amount as he shall deem adequate, for the protection of the United States.

(2) A payment bond with a surety or sureties satisfactory to such officer for the protection of all persons supplying labor and materials in the prosecution of the work provided for in said contract for the use of each such person. Whenever the total amount payable by the terms of the contract shall be not more than $1,000,000 the said payment bond shall be in a sum of one-half the total amount payable by the terms of the contract. Whenever the total amount payable by the terms of

Castle then contacted Benefax and retained it to provide individual sureties to guarantee the payment and performance bonds. Benefax retained Martin H. McGuffin and Terry L. Kinser as individual sureties for the contracts. To be properly accepted as guarantors of these bonds, McGuffin and Kinser submitted notarized Affidavits of Individual Surety (AIS).[2] McGuffin's AIS represented his net worth as $3,782,677, while Kinser's AIS stated a net worth of $7,417,193. Trial testimony revealed that McGuffin signed blank performance and payment bonds and the information was completed later. McGuffin also admitted that the signature on one of the AISs was not his. McGuffin testified that he told Barrick that he was having financial difficulties and the bank would not sign the Certificate of Sufficiency. Barrick told him not to worry and then signed the Certificate of Sufficiency as the President of United Fidelity.

---

the contract shall be more than $1,000,000 and not more than $5,000,000, the said payment bond shall be in a sum of 40 per centum of the total amount payable by the terms of the contract. Whenever the total amount payable by the terms of the contract shall be more than $5,000,000 the said payment bond shall be in the sum of $2,500,000.

40 U.S.C. § 270a(a) (1986). The Miller Act was amended in 1994 to eliminate the requirement that the construction contract exceed $25,000. *See* 40 U.S.C. § 270a(a) (Supp. 1996).

[2] An AIS states the assets and liabilities of the individual surety and the resulting net worth that the surety holds to guarantee the bond. A bank officer or officer of the court must also sign a Certificate of Sufficiency located on the back of the AIS. This certificate represents that the signer is aware of the surety's assets and that the AIS accurately represents the financial position of the surety.

4

Apparently, Kinser's AIS also reflected an inflated net worth. Kinser testified that the AIS showed an inflated net worth because Barrick raised it to $5,000,000 on the AIS and then raised it again to over $7,000,000.[3] Kinser explained that he and Barrick knew that the AIS figures were "incorrect and fraudulent." Later, the Air Force contract officers approved the AISs based on the information provided by the sureties and guaranteed by the signatures on the Certificates of Sufficiency.[4]

Castle issued two checks to Benefax in payment of the bond fees, but asked Barrick not to cash the checks until Castle obtained either a bank loan, a loan from United Fidelity, or until Castle received its first construction and bond reimbursement from the Air Force roofing job. Castle sought outside financing for the mobilization and bond fee costs but was unsuccessful. Consequently, Castle had no mobilization money and could not start the Air Force roofing job nor could it pay for the payment or performance bonds.

Barrick, through United Fidelity, apparently agreed to loan Castle $100,000 for its mobilization costs. Because Castle had no funding, Barrick also agreed to wire transfer the loan proceeds before negotiating Castle's two checks written to Benefax for payment of the bond costs. Barrick gave Upton paid receipts for

_____

[3] A Senior Vice President of Glendale Federal Savings Bank signed the Certificate of Sufficiency for Kinser's AIS.

[4] At the time that these contracts were awarded, the federal contract officers were not required to perform independent investigations into the financial solvency of sureties or the validity of an AIS.

the Air Force roofing job's payment and performance bonds and held Castle's two checks for these bonds.

Contractors are generally paid for their work and materials on a monthly basis by submitting a progress payment claim. *See* 48 C.F.R. § 52.232-5(b). Furthermore, the Federal Acquisition Regulations provide that the government shall, upon request, reimburse the contractor for the cost of the payment and performance bonds upon furnishing the government evidence that the sureties received full payment. 48 C.F.R. § 52.232-5(g).

Upton and Castle submitted to the government a request for reimbursement of the bond costs on both contracts. As evidence that the bonds had been paid, Upton attached the paid invoices from Benefax. These invoices showed that Benefax had received $27,047.40 from Castle for Contract 47 and $12,793 for Contract 52 and that Castle owed nothing on the bonds. The Air Force then issued checks of $27,047.40 and $12,793 to "reimburse" the payment of these premiums or bond costs. Castle never completed the roofing jobs and the sureties did not honor their contractual commitments.

The Grand Jury returned an eight count indictment. Counts one through four charged Barrick, Upton, Castle Construction, and Benefax Surety Corporation[5] with conspiracy to defraud and knowingly submitting false claims to the Air Force on two different construction contracts in violation of 18 U.S.C. §§ 286, 287 and 2. Count five charged Barrick, Benefax, and Susan K. Frericks a/k/a

---

[5] Benefax did not appeal its conviction.

Susan K. Barrick[6] with knowingly and wilfully making false statements to the Air Force in violation of 18 U.S.C. §§ 1001 and 2. Counts six and seven charged Barrick, Benefax, and Roland Aaron Maness[7] with knowingly and wilfully making false statements to the Air Force in violation of 18 U.S.C. §§ 1001 and 2. Count eight charged Benefax and Maness with presenting a falsely made, forged or counterfeit writing to the Air Force in violation of 18 U.S.C. §§ 494 and 2. The jury found Barrick, Upton, and Castle guilty on all charged counts. Barrick, Upton, and Castle filed timely appeals to their convictions and sentences.

## II. Discussion

*A. Sufficiency of the Evidence*

Barrick, Upton and Castle Construction contend that the evidence was insufficient to support their convictions for conspiracy and submitting false claims to the Air Force in violation of 18 U.S.C. §§ 286, 287 and 2. As a general rule we owe great deference to the jury's verdict. *United States v. Walters*, 1996 WL 350701, *4 (5th Cir. 1996). We review a defendant's claim that evidence was insufficient to support a verdict in the light most favorable to that verdict and we will affirm the conviction "`if a rational trier of fact could have found that the government

---

[6] Susan K. Frericks a/k/a Susan K. Barrick pled guilty to a misdemeanor for her role in improperly notarizing the surety's affidavit for Contract 52. She notarized the affidavit without being in the presence of the surety, McGuffin.

[7] The jury found Roland Aaron Maness not guilty on all charged counts.

proved all essential elements of the crime beyond a reasonable doubt.'" *United States v. Schuchmann*, 84 F.3d 752, 754 (5th Cir. 1996) (quoting *United States v. Castro*, 15 F.3d 417, 419 (5th Cir.), *cert. denied*, 115 S. Ct. 127 (1994)).

In order to sustain a conviction under the substantive count for filing false, fictitious or fraudulent claims to the United States under 19 U.S.C. § 287, the government must prove: "(1) that the defendant presented a false or fraudulent claim against the United States; (2) that the claim was presented to an agency of the United States; and (3) that the defendant knew that the claim was false or fraudulent." *United States v. Okoronkwo*, 46 F.3d 426, 430 (5th Cir., *cert. denied*, 116 S. Ct. 1107 (1995). To sustain the conspiracy part of this conviction under 18 U.S.C. § 286, the government must prove: "(1) that there was a conspiracy to defraud the United States; (2) that the defendant knew of the conspiracy and intended to join it; and (3) that the defendant voluntarily participated in the conspiracy." *Id.*

In this case, the record shows that ample evidence exists to support appellants' convictions. Appellants do not contest the first two prongs of their § 287 conviction, i.e., that a false claim was submitted, and that the claim was presented to an agency of the United States. Appellants argue that they did not know that the claim was false or fraudulent. Their contention rests on the alleged ambiguity of the term "payment" as it relates to the payment and performance bonds under the Federal Acquisition Regulations (FARs), 48 C.F.R. § 52.232-5 (1986).

8

Section 52.232-5(g) states: "In making these progress payments, the Government shall, upon request, reimburse the Contractor for the amount of premiums paid for performance and payment bonds (including coinsurance and reinsurance agreements, when applicable) after the Contractor has furnished evidence of full payment to the surety." 48 C.F.R. § 52.232-5(g). Appellants contend that on December 4, 1989, Benefax agreed to accept the two checks from Castle in full payment for the Miller Act bonds. Appellants then agreed that Benefax would not negotiate these checks until Upton obtained outside financing. Because the parties allegedly believed that Castle's writing of these checks constituted payment for the bonds, Castle then submitted claims to the Air Force for reimbursement of the bond costs.

Appellants argue that the language of the Federal Acquisition Regulations is ambiguous in that § 52.232-5(g) requires a contractor to furnish evidence of full "payment" to the surety and does not require the contractor to have "incurred the cost" of the bond. We disagree. The plain language of § 52.232-5(g) provides for the reimbursement of bond premiums. Reimbursement necessarily implies that something has been paid which requires compensation for money spent.[8]

Furthermore, sufficient evidence exists upon which a rational trier of fact could have found that appellants never planned on

_____

   [8]   Webster's defines "reimburse" as "1. to repay; 2. to pay back or compensate (a person) for money spent or for losses or damages incurred." WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 991 (1984).

9

cashing these checks and that their "good faith" misunderstanding of the Federal Acquisition Regulation was, in reality, a scheme to defraud the government. Upton faxed a letter dated October 5, 1989, to Benefax stating that per their "agreement," Castle's first priority was to pay Benefax for the bond premiums from Contracts 47 and 52 through use of the first draw from the Air Force. The first draw was to cover Castle's bonding and mobilization costs. Upton also signed a note to Barrick which referred to their "agreement" and asked Barrick not to deposit the checks until there was a complete wire transfer of funds. In the note, Upton also asked for a "paid in full" invoice to bill the Air Force. Further, the government elicited evidence of Upton's bookkeeping tactics. Upton listed the bond checks as non-debits, essentially acknowledging that those checks would not be cashed. Upton also explained to one of the sureties, Kinser, that he could not pay for the bonds before the job started but that he would get the money from draws against the Air Force and then repay Benefax who would then pay Kinser. Barrick also told Kinser that he would have to wait until Upton received his first draw from the Air Force to receive payment for the bond. Barrick admitted to Agent Eddingfield that, in his business, contractors obtained bonds with the understanding that the checks for the bonds would not be negotiated until the contractor recovered draws from the job.

Testimony from M. Lee Shaffer, a special agent with the Air Force Office of Special Investigations, and Kim Taylor, Castle's office manager/bookkeeper, revealed that Upton never intended for

10

the bond payment checks to be cashed. Upton, in fact, fired Taylor for asking questions about the bookkeeping surrounding these checks and why the checks were recorded as zero debit transactions. Ellen Neal, an accountant hired by Upton in February 1990, also questioned certain record-keeping practices by Upton and was terminated. Based on these facts, the jury did not have to accept the contentions of Barrick and Upton that there were no false claims on the reimbursement of Contracts 47 and 52 because Upton presented checks to Benefax for the payment of the bond fees.

Even though these checks were never cashed, appellants contend that the paid-in-full invoices were not false and Barrick and Upton did not intend to defraud the government by seeking reimbursement. However, ample evidence suggests that Barrick did engage in a scheme whereby under-funded contractors, such as Upton, could obtain construction contracts and improperly obtain "loans" from the government for the bond fees. This scheme permitted under-funded construction companies to receive contract jobs that they were unable to financially support. Therefore, considering the evidence in a light most favorable to the jury verdict and affording the government all reasonable inferences and credibility choices, we hold that the government presented sufficient evidence to show that Barrick, Upton, and Castle knew that the reimbursement claims submitted to the Air Force for the two contract bonds were false claims. Based on the facts in this record, a jury could reasonably conclude that appellants engaged in a conspiracy to defraud the Air Force by seeking reimbursement for these false

11

claims.

*B. Jury Instructions*

Next, appellants contend that the district court erred in refusing to charge the jury on "good faith" and "ambiguity."[9]  "We afford the district court substantial latitude in formulating the jury instructions and review a district court's refusal to give a requested instruction for abuse of discretion." ***United States v. Smithson***, 49 F.3d 138, 142 (5th Cir. 1995) (citing ***United States v. Chaney***, 964 F.2d 437, 444 (5th Cir. 1992)).  To successfully challenge the district court's refusal to include a requested instruction, the appellants must show that their instruction "(1) was a correct statement of the law, (2) was not substantially covered in the charge as a whole, and (3) concerned an important point in the trial such that the failure to instruct the jury on the issue seriously impaired the defendant's ability to present a given defense." ***Id.***

Appellants objected to the district court's refusal to include "good faith" and "ambiguity" in the jury instructions and now argue that the district court's failure to give these instructions seriously impaired their ability to present a "good faith" defense.

---

[9]  Barrick also contends that the district court erred in failing to submit "willfully" to the jury as to the aiding and abetting counts, 18 U.S.C. § 2.  The district court's instructions followed the Fifth Circuit's pattern instructions for these counts and were correct statements of the law.  Therefore, we find no error with the district court's instructions as to 18 U.S.C. § 2.

12

We disagree.  This Circuit permits a district court to refuse to submit an instruction regarding a good faith defense if the defense "is substantially covered by the charge given and the defendant has had the opportunity to argue good faith to the jury."  *United States v. Giraldi*, 1996 WL 339177, *8 (5th Cir. 1996); *and see United States v. Storm*, 36 F.3d 1289, 1294 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 1798 (1995).  Both Barrick and Upton presented testimony and evidence in support of their good faith belief or understanding that the bond fees had been paid by Castle Construction's checks.  Appellants were permitted to argue that, based on this belief, they never intended to defraud the government.

The good faith defense was also substantially covered by the charge.  The district court instructed the jury on "knowingly" and "willfully."  The jury was instructed that "knowingly" "means that the act was done voluntarily and intentionally and not because of mistake or accident."  "Willfully" or "willingly" was defined to "mean that the act was committed voluntarily and purposely, with the specific intent to do something the law forbids - that is to say, with bad purpose either to disobey or disregard the law."  Appellants' good faith defense was substantially covered by the charge given and was argued to the jury.  As such, we hold that the district court did not abuse its discretion by charging the jury in this manner.

Appellants also argue that the district court erred in failing to instruct the jury on "ambiguity" as it relates to the term

13

"payment" under the Federal Acquisition Regulations § 52.232-5(g) because "payment" is not defined by the regulations.[10] The district court refused to allow the jury to decide the meaning of "payment" in § 52.232-5(g). The district court stated: "It borders on the absurd to give an instruction to the jury as to -- they determine regulations and statutes ambiguous. This was either a false claim or not. The Government's position is far more plausible than [appellants], and that is that I should determine, as a matter of law, payment, and then just submit the issue."

We hold that the district court correctly refused to allow the jury to interpret § 52.232-5(g). *See United States v. Vidaure*, 861 F.2d 1337, 1340 (5th Cir. 1988), *cert. denied*, 489 U.S. 1088 (1989). In *Vidaure*, we affirmed a district court's refusal to instruct the jury on whether aggravated robbery met the statutory definition of the term "violent felony" under 18 U.S.C. § 924 because the answer did not depend on probative value of the evidence but instead depended on an interpretation of the statute. *Id.* Similarly, the district court in this case refused to submit an instruction on the term "ambiguity" as it relates to the term "payment" under the Federal Acquisition Regulations because the definition of the term "payment" depends on an interpretation of

_____

[10] Barrick also contends that the district court erred in denying his motion for judgment of acquittal based on evidence that "payment" is an ambiguous term. Barrick fails to cite to authority or present record references in support of his contention. We decline to reach the merits of this argument because claims made without citation to authority or references to the record are considered abandoned on appeal. *United States v. Ballard*, 779 F.2d 287, 295 (5th Cir.), *cert. denied*, 475 U.S. 1109 (1986).

14

the statute and, as such, is a question of law for the court to decide. *Id.* For the foregoing reasons, we agree that the definition of the term "payment" under § 52.232-5(g) is a matter of statutory interpretation and was correctly decided by the court as a matter of law.

*C. Materiality as an Element of 18 U.S.C. § 287*

Barrick maintains that **United States v. Gaudin**, 115 S. Ct. 2310, 2320 (1995), which required the jury to determine materiality under 18 U.S.C. § 1001, also applies to § 287. Barrick argues that the district court committed plain error by failing to submit the question of materiality under § 287 to the jury. This court has not expressly addressed whether materiality is an element of § 287. *See* **United States v. Haynie**, 568 F.2d 1091, 1092 (5th Cir. 1978) ("[T]he issue of whether materiality is an element of a section 287 charge has not been squarely presented to and decided by this court."). In **Haynie**, we concluded without deciding that, if materiality is an element of § 287, "the issue is one for the trial judge to handle as a question of law." *id.; and see* **United States v. White**, 27 F.3d 1531, 1534 (11th Cir. 1994) (quoting same) (holding that it is unnecessary to determine whether materiality is an element under § 287 because the forged signatures are material as a matter of law).[11]

---

[11] Although we find the Eleventh Circuit's decision in *White* instructive, we are compelled to reach the issue of whether materiality is an element of § 287 after the Supreme Court's decision in **Gaudin**.

15

After **Gaudin**, materiality is considered a question of fact for the jury to decide.  **Gaudin**, 115 S. Ct. at 2313-2320.  Therefore, first we must determine whether materiality is an element of § 287 and, if so, we must then ascertain whether the district court committed plain error by failing to submit the question of materiality to the jury.  Four Circuit Courts have addressed this issue reaching two different conclusions.[12]  *Compare* **United States v. Wells**, 63 F.3d 745, 750 (8th Cir. 1995) (holding that materiality is an essential element of a § 287 charge), *cert. granted*, 116 S. Ct. 1540 (1996), *and* **United States v. Snider**, 502 F.2d 645, 652 n.12 (4th Cir. 1974) (same) *with* **United States v. Taylor**, 66 F.3d 254, 255 (9th Cir. 1995) (holding that while § 1001 expressly makes materiality an element of the offense, § 287 does not and **Gaudin** does not apply to a § 287 conviction), **United States v. Parsons**, 967 F.2d 452, 455 (10th Cir. 1992) (holding that materiality is not an element required by § 287) *and* **United States v. Elkin**, 731 F.2d 1005, 1009 (2d Cir. 1984) (same), *cert. denied*, 469 U.S. 822 (1984).

In making our own determination of whether materiality is an element of § 287, we look to the plain language of the statute.

---

[12]    We acknowledge that the Supreme Court has granted certiorari in **United States v. Wells**, 116 S. Ct. 1540 (1996), on the issue of whether materiality is an element of 18 U.S.C. 1041, the crime of making false statements for the purpose of influencing a federally insured banking institution.  As in 18 U.S.C. § 287, materiality is not explicitly included in the definition in § 1041. Therefore, the Supreme Court's decision in **Wells** may influence this case and others that have wrestled with the scope of **Gaudin**'s holding concerning materiality. However, we do not believe that the decision in this case should be stayed pending the Supreme Court's decision in **Wells**.

16

Section 287 states:

> Whoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be imprisoned not more than five years and shall be subject to a fine in the amount provided in this title.

18 U.S.C. § 287 (Supp. 1995).  The plain language of this provision in no way suggests that materiality is an element of the offense. "When we find the terms of a statute unambiguous, judicial inquiry is complete except in rare and exceptional circumstances." *Demarest v. Manspeaker*, 498 U.S. 184, 190, 111 S. Ct. 599, 604 (1991) (citations omitted).  The plain language of a statute must be followed unless the language is "so bizarre that Congress could not have intended it." *Id*. at 191, 111 S. Ct. at 604.  We therefore agree with our sister Circuits' decisions in *Taylor*, 66 F.3d at 255, *Parsons*, 967 F.2d at 455, and *Elkin*, 731 F.2d at 1009, and hold that materiality is not an element of 18 U.S.C. § 287. *Accord United States v. Irwin*, 654 F.2d 671, 682 (10th Cir. 1981) (the legislative history of § 287 does not indicate that Congress intended to make materiality an element of the statute), *cert. denied*, 455 U.S. 1016 (1982).  Because we hold that materiality is not an element of § 287, Barrick's argument that the district court committed error by not submitting the question of materiality to the jury fails.


*D. Materiality as an Element of 18 U.S.C. § 1001*

17

The jury found Barrick guilty of counts five, six, and seven for making false statements in violation of 18 U.S.C. § 1001. Prior to *Ray v. United States*, 481 U.S. 736, 737, 107 S. Ct. 2093, 2093-94 (1987), once a defendant's conviction on a single count has been sustained, it was not necessary for the appellate court to reach the merits of the other counts. *See, e.g., United States v. Strickland*, 509 F.2d 273 (5th Cir. 1975) (explaining the concurrent sentence doctrine). However, under *Ray*, the district court's $50 assessment for each count serves as a collateral consequence of those convictions and, in this case, forces us to consider Barrick's remaining arguments. *Ray*, 481 U.S. at 737, 107 S. Ct. at 2093-94.

At the time of trial, this circuit had held that materiality was an element of § 1001, but it was considered a question of law for the court to decide. *United States v. Hausmann*, 711 F.2d 615, 617 (5th Cir. 1983). Based on this prior precedent, Barrick did not object to district court's failure to charge the jury on materiality. When the Supreme Court decided *Gaudin*, which was after Barrick's trial but before the case was argued on appeal, materiality became a question of fact for the jury to decide. *Gaudin*, 115 S. Ct. at 2320. We review the district court's failure to charge the jury on the question of materiality under § 1001 for plain error when a defendant fails to object to the district court's tendered instruction. *United States v. Jobe*, 77 F.3d 1461, 1475 (5th Cir. 1996) (failure to object to a district court's instruction requires a review for plain error).

18

Under plain error review, the petitioner must show that: (1) error occurred; (2) the error was clear or obvious; and (3) the error affected the petitioner's substantial rights. *United States v. Calverley*, 37 F.3d 160, 162-64 (5th Cir. 1994) (en banc) (citing *United States v. Olano*, 113 S. Ct. 1770, 1776-79 (1993)), *cert. denied*, 115 S. Ct. 1266 (1995). The Supreme Court has added what amounts to a fourth factor, that is, even if the petitioner establishes these first three factors, a reviewing court "need not exercise its discretion to correct the error unless it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Jobe*, 77 F.3d at 1476 (citing *Olano*, 113 S. Ct. at 1778). Therefore, even if we assume that Barrick has shown that error occurred; that the error was clear or obvious; and that the error affected the petitioner's substantial rights, we may exercise our discretion to sustain the conviction. *Id.*

After a complete review of the record, we cannot say that the *Gaudin* error affected the fairness, integrity, or public reputation of these judicial proceedings. Consequently, we decline to exercise our discretion to correct the error in Barrick's conviction under § 1001.

*E. Restitution: Upton and Castle Construction*

Upton and Castle argue that the district court erred in ordering restitution to materialmen and supplier "victims" not

19

named in the indictment.[13]  Appellants recognize that *United States v. Pepper*, 51 F.3d 469, 473 (5th Cir. 1995), expressly allows for restitution to be ordered for unnamed victims of a crime when the scheme is specifically defined in the indictment.  However, appellants maintain that, in this case, the "scheme" was limited to obtaining two roofing contracts.  They assert that the district court's restitution assessment illogically extends *Pepper* to include restitution for all losses that occurred as a result of their successful bids on the roofing contracts.  Appellants maintain that the materialmen and suppliers are not victims of the scheme alleged in the indictment but were merely victims of Castle's failure to complete the roofing jobs.

We agree.  "Restitution for victims can only be awarded for the loss caused by the specific offense that is the basis of the offense of conviction."  *Pepper*, 51 F.3d at 473 (citing *Hughey v. United States*, 495 U.S. 411, 413, 110 S. Ct. 1979, 1981 (1990)). In the present case, Upton and Castle were convicted of conspiracy to defraud the United States and of presenting false claims to the United States in violation of 18 U.S.C. §§ 286, 287 and 2.  The charges involved the submission of fraudulent reimbursement claims relating to bond fees for two government roofing contracts. Nothing in the indictment suggests that the criminal conduct of fraudulently obtaining these contracts caused losses to materialmen

---

[13]  Barrick did not raise the issue of whether the district court properly ordered restitution on appeal.  Consequently, he has waived that issue. *United States v. Miller*, 952 F.2d 866, 874 (5th Cir.), *cert. denied*, 505 U.S. 1220 (1992).

and suppliers.

The record shows that Upton and Castle completed 92 percent of contract 47 and 78 percent of contract 52. Uncontroverted evidence supports Upton and Castle Construction's argument that the United States Department of Labor froze all progress payments to Castle on these contracts because of labor union wage disputes with its employees. As a result, Castle walked off the job, but that occurred seven months after it made the fraudulent claims to the Air Force. No evidence suggests that the losses sustained by the materialmen and suppliers were related to the fraudulent claims charged in this indictment. Consequently, we hold that the district court erred in ordering restitution for the materialmen and suppliers not named in the indictment and vacate the restitution assessments for materialmen and suppliers who suffered losses due to Castle's failure to complete the roofing jobs.

*F. Other Sentencing Issues*

1. Obstruction of Justice

Barrick maintains that the district court erred in imposing a two level increase in his offense level for obstruction of justice based on his failure to produce subpoenaed corporate records and his lies to the grand jury that he had produced all relevant records. *See* United States Sentencing Commission, *Guidelines Manual*, § 3C1.1 (Nov. 1995). Barrick contends that, during plea negotiations, the government discovered that he had not produced certain records and that he had lied to the grand jury. Because

21

the government gained this information during plea negotiations, the production of records and the veracity of his statements to the grand jury should have been excluded from evidence under FED. R. CRIM. P. 11(e)(6)(D)[14] and U.S.S.G. § 1B1.8.[15]

We afford a district court great deference in its application of the sentencing guidelines. *Storm*, 36 F.3d at 1295. A finding of obstruction of justice under § 3C1.1 is a factual finding reviewed for clear error. *Id.* However, we review the district court's interpretation or application of the sentencing guidelines de novo. *United States v. Tedder*, 81 F.3d 549, 550 (5th Cir. 1996). In this case, Barrick erroneously relies on Rule 11(e)(6)(D) for protection from his false testimony before two

---

[14] Rule 11(e)(6)(D) states:

> (6) Inadmissibility of Pleas, plea Discussions, and Related Statements. Except as otherwise provided in this paragraph, evidence of the following is not, in any civil or criminal proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions:
> . . .
> (D) any statement made in the course of plea discussions with an attorney for the government which do not result in a plea of guilty or which result in a plea of guilty later withdrawn.

[15] U.S.S.G. § 1B1.8 states:

> (a) Where a defendant agrees to cooperate with the government by providing information concerning unlawful activities of others, and as part of that cooperation agreement the government agrees that self-incriminating information provided pursuant to the agreement will not be used against the defendant, then such information shall not be used in determining the applicable guideline range, except to the extent provided in the agreement.

grand juries. The district court held hearings, heard witnesses, and made extensive findings on Barrick's two level increase in offense level for obstruction of justice. The district court explained:

> Well, the objection with regard to the recommendation of the Probation Department on obstruction of justice is overruled. I find factually that the testimony of Mr. Barrick in the grand jury on Page 11 of Exhibit 11, quote, "[a]nd there is no one else that would have any records to your knowledge that pertain to Benefax? Answer: No, sir. Or to Fidelity and Surety? Answer: No, sir.
>
> Question: United Fidelity, was that the other business?
>
> Answer: United Fidelity and Trust Company.
>
> Question: All right, sir. Obviously what we're trying to establish on this record is that we have obtained all of the records which were sought in the subpoena. And I take it you are willing to assure us that you have complied fully with the subpoena and there are no other records in existence to your knowledge?
>
> Answer: That is correct."
>
> That that [sic] was false testimony as the undisputed evidence establishes clearly that there were mounds of other evidence.
>
> And then again on July 15, 1992, on Page 7 of Exhibit 10, Line 24, "So that your testimony is you have fully complied now with Items Number 3 and 4 and previously fully complied with Items 1 and 2?
>
> That is correct."
>
> Even at that time there were more records available that were delivered.
>
> I also find factually that in light of the failure to provide these records, which obviously delayed the prosecution of this case and the investigation by the grand jury and the presentation of charges, so that ultimately these cases are what I call stale. We are trying them in

23

> 1994 for events that occurred years before -- that Mr. -- that one of the results and purposes of Mr. Barrick ultimately was to attempt to negotiate a favorable plea agreement before the Government had all of the financial information and could see the extent and duration of the criminal offenses that were involved in this.
>
> So I will sustain the recommendation of the Probation Department with regard to the obstruction of justice.

Barrick's reliance upon FED. R. CRIM P. 11(e)(6)(D) to shield him from an increase in offense level for obstruction of justice is misplaced. We have held that Rule 11(e)(6)(D) and FED. R. EVID. 410(4) do not prohibit statements made during plea negotiations to be used during sentencing. *United States v. Paden*, 908 F.2d 1229, 1234-35 (5th Cir. 1990), *cert. denied*, 498 U.S. 1039 (1991); *and see United States v. Medina-Estrada*, 81 F.3d 981, 985-86 (10th Cir. 1996) (holding same). The two rules are virtually identical and deserve the same treatment for purposes of their application to sentencing proceedings. *Id.; and see* J. Moore & H. Bendix, MOORE'S FEDERAL PRACTICE § 410.01[1.1] (2d ed. 1981) (suggesting that FED. R. CRIM. P. 11(e)(6)(D) and FED. R. EVID. 410 should be treated the same).

In *Paden*, we also stated that "[a]t sentencing, the district court may rely upon evidence of defendant's credibility and responsibility that is `sufficiently reliable.'" *Paden*, 908 F.2d at 1225. In the present case, Barrick told the government that he lied to the grand jury about submitting all records requested in the subpoena. The district court correctly found these statements, made by Barrick himself, to be sufficiently reliable and used them

24

at sentencing to increase Barrick's offense level for obstruction of justice. After reviewing the record, we are convinced that the district court committed no error.

Barrick also argues that the district court erred in increasing his offense level for obstructive conduct unrelated to his offense of conviction. Barrick maintains that his false grand jury testimony did not relate to the instant case and, as such, should not be considered in applying § 3C1.1. However, the enhancement for obstruction of justice under § 3C1.1 is proper any time the defendant is aware of the action or investigation against him and he conceals or attempts to conceal information material to the investigation, prosecution, or sentencing of the instant offense. *United States v. Lister*, 53 F.3d 66, 71 (5th Cir. 1995). In this case, the obstruction enhancement was based on Barrick's untruthful testimony to the grand jury and his failure to produce all relevant documents ordered by a subpoena. Even if we assume that Barrick's untruthful testimony and failure to produce certain documents were unrelated to the offense of conviction, § 3C1.1 does not require the obstructive conduct to be directly related to the offense of conviction. *Id.* A sufficient nexus appears here. For these reasons, we hold that the district court did not err in increasing Barrick's offense level for obstruction of justice under U.S.S.G. § 3C1.1.[16]

---

[16] Because we find no error in the district court's application or findings concerning U.S.S.G. § 3C1.1, we need not address Barrick's other arguments contesting the obstruction enhancement.

## 2. "Organizer" of Criminal Activity

Barrick contends that the district court erred in determining that he was a "leader" or "organizer" under U.S.S.G. § 3B1.1 and, therefore, subject to a four level increase in offense level. We review a district court's finding that a defendant was a "leader" or "organizer" for clear error. *United States v. Gaytan*, 74 F.3d 545, 561 (5th Cir. 1996).

Barrick's argument appears to focus on his contention that he was not a "leader" and that his organizational role in this offense merely characterized him as a "middleman," not subject to the four level enhancement. We find this argument unpersuasive. The district court clearly identified Barrick as an "leader" or "organizer" under the guidelines. The court stated:

> [A]s far organizers, I've got Mr. Barrick's daughter. The office manager had to know what was going. [sic] Mr. Maness, even though he was acquitted, was involved. Mr. Upton, Mr. Kinser, Mr. McGuffin, Mr. Singh, Pam McDaniel, who is the office manager; and at least five or six of the other sureties that I've heard in evidence that aren't identified by name in the presentence report, but that I've heard; and two of whom, -- Mr. Kelvington has indicated -- like Mr. Singh, didn't even come close on their assets. . . .I see the organizer of five persons as a person who, in a criminal activity does organize and use five people for the criminal event, and there is no question that Mr. Barrick did that with regard to the sureties, the presentation of those records to the Government. There are far more than five involved in these criminal activities -- sureties that couldn't cover large overdrafts, much less the millions of dollars that they were on in the individual sureties.

United States Sentencing Guidelines § 3B1.1, comment. (n.4) lists the following factors for a court to consider in determining

26

whether a defendant acted as a "leader" or "organizer:"

> the exercise of decision making authority, the nature of the participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree or control and authority exercised over others.

After a thorough review of the record, we find it replete with evidence supporting the district court's finding that Barrick meets some, if not all, of these requirements. Therefore, we find no clear error.

## CONCLUSION

Barrick's conviction and sentence is AFFIRMED on all counts. Upton and Castle Construction's convictions are AFFIRMED on all counts. Upton and Castle Construction's sentences with respect to restitution are VACATED and REMANDED for recalculation consistent with this opinion. All other sentences are AFFIRMED.

**AFFIRMED** in part and **VACATED** and **REMANDED** in part.